MARGARETHA E. GULLIVER

*v.*

JOSEPH ROELLE.

</div>

*Filed at Ottawa March 18, 1881—Rehearing denied September Term, 1881.*

1. STOCKHOLDERS *in insurance companies—of their liability under act of 1869.*   The 16th section of the general Insurance law of 1869 makes shareholders and directors of insurance companies organized under that act, severally liable for all debts or responsibilities of their respective companies, to the amount by them subscribed; until the whole amount of the capital stock shall be paid in, and a certificate thereof recorded, as therein provided; and section 19 of the same act imposes the same

liability on shareholders in companies organized under special charters, and brought under the provisions of the general law.

2. SAME—*"corporator" means shareholder.* Under section 16 of the act, as well as sec. 2 of art. 10 of the constitution of 1848, the word "corporators" is used in the sense of shareholders, and not in that of commissioners or promoters of the organization of the corporations.

3. SAME—*effect of act of 1869 on companies organized before its passage.* Under the general Insurance law of 1869, the capital stock of companies doing business under previous charters was to continue the same as authorized in their respective charters, and all investments of their capital stock and surplus, according to their charters, were to remain unaffected by the general law.

4. SAME—*saving of charter privileges to previously formed companies.* The exception in section 19 of the act, in favor of companies previously organized, that they shall "also be entitled to all the privileges and powers granted" by their charters, secures to such companies, and prevents the general act from impairing, their privileges and powers to effect fire, marine, life and health policies of insurance. Matters performed in organizing were not required to be abandoned, and performed under the general law, but as to their subsequent dealings it was intended to bring them under the controlling power of the State, to provide security to their creditors as provided in the general law.

5. SAME—*duty to procure Auditor's certificate.* By the act, insurance companies organized under special charters were required to procure the certificate of the Auditor of the payment of all the stock subscribed, and record the same, as a condition to authorize them to continue in business, and relieve its shareholders from the individual liability imposed by the 16th section of such act.

6. SAME—*duty of Auditor to examine and give certificate.* An insurance company organized under a special charter prior to the passage of that law, may require the Auditor of the State to have its affairs examined, and ascertain whether all of its capital stock has been paid in and invested as required by its charter or the general law, and if so found, to give the requisite certificate, the same as if such company had been organized under the general law.

7. CORPORATION—*right to impose further duties and liabilities.* The acceptance of an amendment to the charter of a private corporation, which reserves the right to bring such corporation under any general law regulating the same, makes it subject to the power of the legislature to impose further duties and make restrictions not contained in the charter.

8. DECLARATION—*in suit to enforce liability of stockholder for debt of corporation.* In a suit by a creditor of an insurance company to enforce the individual liability of a shareholder under a law making stockholders liable to the extent of their stock until the entire capital stock is paid in and invested,

and a certificate thereof made and recorded, the declaration averred that the defendant had subscribed for fifty shares of the capital stock of the company, and that the whole amount of the capital of the corporation had not been paid in, and that no certificate of such payment had been given or recorded, as required by the statute, but on the contrary not more than one-half of said capital stock had ever been paid in to said company: *Held*, on demurrer, that the declaration showed a right of recovery.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

Messrs. SHUFELDT & WESTOVER, for the appellant:

1.   The legislature had the right, under the constitution, to make the provisions of the general law of March, 1869, applicable to all insurance companies theretofore organized and transacting business in this State.   Constitution of 1848, art. 10.

2.   Independent of the foregoing proposition, in the case at bar, the accepted amendment to the charter of the company expressly stipulating that the company should be subject to any general law thereafter passed on the subject of insurance companies, brings the company fully under all the provisions of the general law of March, 1869.   *McLaren* v. *Pennington*, 1 Paige Ch. 102; *Miller* v. *The State*, 15 Wall. 478; *Tomlinson* v. *Jessup*, id. 454; *Suydam* v. *Moore*, 8 Barb. 358; *In re Reciprocity Bank*, 22 N. Y. 9; *Sherman* v. *Smith*, 1 Black, 587; *In re Oliver Lee's Bank*, 21 N. Y. 9; *Stanley* v. *Stanley*, 26 Me. 191; *Butler* v. *Walker*, 80 Ill. 345.

3.   The liability upon the appellee, a stockholder, under section sixteen of the law of March, 1869, is to the creditors of the corporation personally, and is no part of the company's assets.   *Paine* v. *Stewart*, 33 Conn. 516; *Bank of Poughkeepsie* v. *Ibbotson*, 24 Wend. 473; *Moss* v. *McCullough*, 7 Barb. 279; *Harger* v. *McCullough*, 2 Denio, 119; *Burr* v. *Wilcox*, 22 N. Y. 551; *Dutcher* v. *Central Nat. Bank*, 11 Nat. B. Reg. 457; *Culver* v. *Third Nat. Bank*, 64 Ill. 529.

4.　The appellant, a creditor of the company, has an action at law against appellee, a stockholder, for the amount of appellant's claim against the company, limited by the amount of appellee's liability, to-wit, an amount equal to his stock.　*Culver* v. *Third Nat. Bank,* 64 Ill. 529; *Paine* v. *Stewart,* 33 Conn. 516; *Stanley* v. *Stanley,* 26 Me. 191; *Burr* v. *Wilcox,* 22 N. Y. 551; *Spear* v. *Crawford,* 14 Wend. 20; *Garrison* v. *Howe,* 17 N. Y. 458; *Adkins* v. *Thornton,* 19 Geo. 325; *Bank of Poughkeepsie* v. *Ibbotson,* 24 Wend. 473; *Lowery* v. *Inman,* 46 N. Y. 119; *Harger* v. *McCullough,* 2 Denio, 119; *Judson* v. *Rossie Galena Co.* 9 Paige, 597.

5.　The case of *Butler* v. *Walker,* 80 Ill. 345, is nearly parallel with the case at bar, and unless overruled is decisive of this.

Messrs. Hoyne, Horton & Hoyne, for the appellee:

Section 19 of the general Insurance law of 1869, makes an express exception with respect to the capital stock and the investment and assets of companies that were already organized under special charters.

Capital stock is the sum divided into shares which is raised by mutual subscription of the members of a corporation, and upon which calls may be made.　Bouv. Law Dic. 240; Angell & Ames on Corp. secs. 556, 517; 1 Sandf. Ch. 280; 28 Barb. 318; 4 Zeb. 195.

There is another very important exception made by section 19, that companies already organized under special charters "shall also be entitled to all the powers and privileges granted by said charters." This clearly manifests an intention to save to all such companies all the powers and privileges they had before, without limitation or restriction.

We cite a few authorities on the principle, well recognized in the construction of all statutes, that the courts will not so construe them as to affect vested rights, or give them a retroactive effect.　*Dash* v. *Van Vleeck,* 7 Johns. 477; *Van*

*Valkenbergh* v. *Torrey*, 7 Conn. 252; *Sayre* v. *Kisner*, 8 Ward, 661.

A statute will not be construed to be retroactive if all its language will bear a prospective construction. An intent to violate the constitution will not be assumed. *New York and Oswego Midland Railroad Co.* v. *Van Horn*, 57 N. Y. 473.

This court has repeatedly had occasion to decide, that as a general rule a statute is to operate in future only, and is not to be construed so as to affect past transactions. A retrospective effect will not be given, unless it clearly appears such was the will of the legislature, especially where it tends to produce injustice or inconvenience. *Thompson* v. *Alexander*, 11 Ill. 55; *Marsh* v. *Chestnut*, 14 id. 227; *Bruce* v. *Schuyler*, 4 Gilm. 221; *Somerset* v. *Dighton*, 12 Mass. 383.

Messrs. COOPER, PACKARD & GURLEY, also for the appellee:

The declaration sets out an indebtedness from the Germania Insurance Company to the plaintiff, and alleges that the defendant is liable for that indebtedness because he was a corporator of that company, all the stock of which was never paid in, etc. Neither the charter of the company nor any amendment thereto requires that the stock shall be fully paid in, or any certificate thereof recorded, and hence no liability is shown by the facts alleged.

To hold a stockholder for the debts of a corporation because the latter has not collected all the stock subscriptions from its other stock subscribers, recourse must be had to the charter creating it, or to some statute the effect of which is that of an amendment to such charter. Angell & Ames on Corp. (10th ed.) sec. 41; ibid. secs. 591, 595.

There was no individual liability for the debts of the Germania Insurance Company imposed upon its stockholders by the general Insurance law of 1869.

After declaring that the old companies, previously incorporated and doing business in this State, are brought under

10—100 ILL.

all the provisions of the law, the statute proceeds to make three exceptions, each one of which, we submit, is fatal to appellant's cause of action:

. 1st.   That "their capitals may continue of the amounts and character named in and authorized by their respective charters during the existing terms of such charters."

2d.   That "the investments of the capital and assets of such companies may remain the same as prescribed by their charters, anything in this act to the contrary notwithstanding."

3d.   That "such companies shall also be entitled to all the privileges and powers granted by said charters."

Conceding that by section 19 of the act of 1869 the Germania Insurance Company was brought under all the provisions of that act, yet it does not follow that its trustees and corporators are liable for its debts, as prescribed by section 16.

In *Hawthorne* v. *Calef*, 2 Wall. 10, the repeal of a law making subscribers of a corporation liable for its debts after a debt was contracted, was held unconstitutional.

Upon this point, see further: *Cunan* v. *State of Arkansas*, 15 How. 304; *Green* v. *Biddle*, 8 Wheat. 1; *Bronson* v. *Kinzie*, 1 How. 311; *McCracken* v. *Haywood*, 2 id. 608; *Woodruff* v. *Trapnal*, 10 id. 190; *Slee* v. *Bloom*, 19 Johns. 456; *Wheeler* v. *Frontier Bank*, 23 Me. 308; *Ireland* v. *Palestine Co.* 19 Ohio St. 369; *Enfield Toll Bridge Co.* v. *Conn. River*, 7 Conn. 44.

Mr. JUSTICE WALKER delivered the opinion of the Court:

The. questions presented by this record have been before us on previous occasions, but we do not content ourselves by saying *stare decisis*.   More elaborate and thorough arguments have been made and filed than had been presented in the former cases, and new issues and questions have been raised and discussed.   We have, therefore, owing to their importance, reviewed the grounds on which those decisions were

based. In doing so, we have devoted more time to their investigation and discussion than is usual in deciding cases. No case in this court has, perhaps, ever received more thorough investigation. We will now proceed to announce some of our reasons and the conclusions reached.

The main question involved is, whether the 16th section of the general Insurance law imposes any liability on shareholders in companies organized under that act, and if so, does section 19 of the same act impose the same liability on shareholders in companies organized under special charters, and brought under the provisions of the general law? The 16th section reads: "The trustees and corporators of any company organized under this act shall be severally liable for all debts or responsibilities of such company, to the amount by him or them subscribed, until the whole amount of the capital of such company shall have been paid in, and a certificate thereof recorded as hereinbefore provided."

The true meaning of the words "trustees and corporators," as used in this section, is the matter of dispute in this case. On one side it is claimed that the word "corporator" is used as and for a shareholder; whilst on the other it is denied that it has or was intended to have such a meaning, but is used as synonymous with commissioner or promoter in organizing the company. It can scarcely admit of a doubt that the general and popular meaning of the word "corporator" concurs with the highest lexicographical authority,—that it means a member of a corporation; and all know that to be a member of a stock company a person must be a shareholder, or to be a member of a mutual company, a policyholder. This is so plain that the citation of authority is unnecessary. And there can be no doubt that such is the sense in which the term is used in the 2d section of article 10 of the constitution of 1848. That section provides: "Dues from corporations not possessing banking powers or privileges shall be secured by individual liabilities of the corporators, or other

means, as may be provided by law." It is impossible to suppose the body which framed this section ever supposed that holding the persons named in a charter for purposes of organization liable, would afford security to the creditors of these great bodies, transacting annually millions of dollars of business. That body could have intended nothing short of the liability of stockholders, or some other equivalent security. This being so, the constitutional requirement operates as an imperative command on the General Assembly, and being under that obligation, we must presume that body, in framing a general incorporation law, would endeavor to discharge the duty thus imposed. We can not, therefore, suppose that body would, for the purpose of affording the security, gravely insert the provision contained in the 16th section, simply to hold the promoters liable to the full extent of their subscription for stock, when each may have never subscribed for a dollar of the stock of the company, or may, at the time of its organization, have had but slender means, or been of doubtful solvency. It is impossible to call this security for the vast debts and liabilities of these companies. No such purpose can be justly imputed to any legislative body. Much less, as has been suggested, can it be supposed that body intended only to render the promoters of the organization liable, by enacting that section, for the comparatively trifling expense of preparing the charter and procuring the necessary subscriptions for the capital stock. For such expenses the corporation is not liable, and they are in no sense dues or liabilities of the corporation, and liabilities of the company only are embraced in the provisions of the 16th section. *Railroad Co.* v. *Sage,* 65 Ill. 328; *Insurance Co.* v. *Smith,* id. 309. Is such a presumption reasonable, when the General Assembly have made no other provision for the security of the creditors of such bodies? No one can deny that it was intended to impose a liability on some class of persons, to the amount of stock by him or them

subscribed, until all of the stock was paid and the certificate recorded. And it seems to be apparent that the term "corporator" was used in its ordinary sense, and can not with reason be referred to any other than shareholders in the company.

If, then, as there seems to be no doubt, this is the true interpretation of the language of that section, as applied to shareholders in companies organized under the general law, what effect has the 19th section produced on companies organized under special charters and the stockholders therein? That section provides, that "all insurance companies heretofore organized in the State of Illinois, and now doing business in this State, are hereby brought under all of the provisions of this act, except that their capitals may continue of the amounts and character named in and authorized by their respective charters during the existing term of such charters, and the investments of the capital and assets of such companies may remain the same as prescribed by their charters, anything in this act to the contrary notwithstanding; and such companies shall also be entitled to all of the privileges and powers granted by said charters."

Inasmuch as the General Assembly, in granting an amendment to the charter to this company, expressly reserved the right to bring it under any general law regulating insurance companies that might be adopted, and it accepted the amendment, this case is free from the question of legislative power to impose further duties and make restrictions not contained in the charter. That power can not be questioned in this case, and when the meaning of the 19th section is ascertained, it only remains to apply it to this company and its stockholders. Then what effect did the adoption of that section produce on this company?

The first clause of that section, in terms, brings this and all other insurance companies doing business under charters from the State, and within its limits, under all of the provi-

sions of the act. But to the enactment there are several excep-
tions. There is an exception that their capital may continue
the same as authorized by their charters, both in character
and amount, and the investment of their capital and assets
may remain the same as required by their charters, and
they shall be entitled to all the privileges and powers granted
by their charters. It is not denied that this company, to
some extent and for some purposes, was controlled by the
general law; but it is insisted that these exceptions dimin-
ish the operation of the act to a mere nominal control,—that
it does not affect any of the powers granted by the charter,
nor has it enlarged its powers or duties.

The charter of this company authorized it to invest or loan
its capital on stocks, *bottomry* and *respondentia*, or in bonds
and mortgages, or on personal security. Now, if its capital
and surplus were thus invested, by the exception they could so
remain; nor was the company required to increase its capi-
tal to conform to the general law, as it was by the exception
exempted from such requirements, and the last clause saves
to the companies acting under special charters all of the
privileges and powers granted by their charters. This last
reservation is claimed to be repugnant to the provisions of
the act which impose any duties or requirements not con-
tained in the charter, and impair their corporate rights.

It is urged that the charter provided, that when $100,000
shall be subscribed, and $10,000 paid in, and the stock not
paid in shall be secured by mortgage on real estate worth
at least fifty per cent more than the amount secured, or by
pledge of public stocks of the United States, or any of the
States or counties therein, or incorporated companies, etc.,
the company may organize and commence the transaction of
business, and to bring this company under the provisions of
the general act would infringe this right and be repugnant to
the savings of the section. This is, we think, a misconcep-
tion of the true meaning of the statute. If the stock was

paid in or invested as authorized by the charter, the 19th section, in terms, permits it to so remain, unaffected in the slightest degree. The charter required security or investment to be made in the securities enumerated, and it must have been done as required, and if so, that investment was protected, and nothing further was required by the act to be done in regard to the security or investment of the capital. There was no infringement of any of its chartered privileges or powers by the first clause of the 19th section, as limited by the last clause of that section.

Then what was intended by the last exception in the section, "and such companies shall also be entitled to all the privileges and powers granted by said charters?" This manifestly secured to them, and prevented the act from impairing, their privileges and powers as insurance companies. By the charter this company was empowered to effect fire, marine, life and health insurance. This was its privilege, and such was its power. Nor is it shown, nor does it appear, that any or either of these privileges or powers are impaired by any provision of the act, nor have counsel pointed out any right that is or can be so affected by the general law. Its further purpose was to secure to companies brought under the provisions of the act the unimpaired enjoyment of the franchises and powers conferred by their charters, and not granted by the general law. If their charters contained grants not conferred by the act, they were preserved in full force, but it was intended to bring them under the controlling power of the State, to provide security to their creditors, as provided in the general law.

It is unreasonable to suppose that the General Assembly would do so inconsistent an act, as in the first clause of the 19th section of the law to bring all chartered companies of the State under the provisions of the act, and in the last clause exempt them from the operation of the act. Such folly can not be imputed to that body. It no doubt had a consistent

purpóse in adopting both clauses, and we fail to perceive such repugnancy as repeals or abrogates either clause, but they may each be rendered operative. The General Assembly, by this language, only intended to require such companies to comply with such provisions as were practical. Matters which had been performed in organizing could not be required to be abandoned and annulled, to be performed under the general law. But it was intended that such companies should conform their business, pay or invest their capital as required by their charters, and be controlled by the general law in furnishing more capital when required, and subject to have their charters annulled in the mode therein provided, and they are brought under the provisions of section 16 as a part of the plan for the government and control of all companies, whether organized under special charters or under the general law, to afford security to their creditors.

Then who are embraced in the term "trustees," in the 16th section? Manifestly the directors, or persons selected by the shareholders, at the time of organizing, to manage and control the affairs of the body. It can refer to no other class of persons. Such is its manifest meaning in the 4th section of the act, where the two are used as convertible terms. It provides for the election of "trustees or directors," each of whom is required to own $500 worth of stock, and a majority to be citizens of the State. And the 11th section authorizes the corporators, trustees or directors, as the case may be, to make by-laws. Manifestly corporators here mean shareholders. It surely was not intended that the promoters of the organization shall, or even may, prescribe by-laws for the government of a company and the management of its future business, when they may not be members of the company. By-laws are not required until the company is organized, and under the 11th section, when organized, either the shareholders or the trustees or directors, as they may be designated, may adopt by-laws. If the charter pro-

vides that the shareholders shall adopt them, they may act in conformity to the charter. So of the trustees or directors, whichever they may be called, when the charter so provides. This is done after the company is organized, and the section can not, by any construction, apply to the promoters.

It is also insisted, that had the General Assembly intended to render shareholders in companies transacting business under special laws liable, provision would have been expressly made by which the certificate that the stock was all paid could have been obtained. Such a conclusion does not necessarily follow. If the intention was to hold them so liable until paid or secured, and the certificate obtained and recorded, the means are undeniably provided by the statute,—if not in terms, then it can be had in the most practical manner.

The General Assembly has provided that certain preliminary steps shall be taken and observed in organizing a new company. The last, and that which licenses the company to transact its business, is the certificate that all of the capital stock required by the charter has been paid in, and is possessed by the company, in money or in such stocks and bonds and mortgages as are required by the 8th section of the act, which certificate, made by the Auditor, is required to be filed in the office of the clerk of the county, and is declared the authority for the commencement of business by the company. Why require the capital stock to be paid in and held in money, stocks, bonds or mortgages? Obviously, as we have seen, to afford security to the creditors of such companies, to the full extent of their capital stock. This security was one of the controlling purposes of the act, and in obedience to the requirements of the constitution, and to render the payment of the capital stock certain, the shareholders were rendered liable to the amount they should severally subscribe until all of the stock should be paid in, and the certificate of the fact by the Auditor was procured, filed and. recorded, as required by the 10th and 16th sections. This is clearly the

requirement and the reason that prompted the action of the General Assembly as to the liability of shareholders in companies organized under the general law.

The same reasons existed for requiring the same security to creditors of companies specially organized as those formed under the general law. There is not, nor can there be, the slightest reason for a difference, in this respect, between the two kinds of companies. The requirements of the constitution were the same with both. The necessity for securing creditors is as imperative in the one class as the other. Hence the enactment of the 16th section creating the liability of shareholders in companies organized under that law, and of the 19th section bringing all companies acting under special charters under the same liability, and of the 21st section, which requires them to report to the Auditor the condition of their companies on the first day of January of each year, giving the amount of capital paid in, and in what manner invested, together with other information. From this it is clear that in these several respects the intention was to place both classes on precisely the same footing,—to create the same liability in every respect, unless exempted by their special charters. They were not exempted from procuring and recording the certificate required by the 10th and 16th sections, nor were the shareholders exempted from paying in or securing their capital stock, or from the liability imposed by the 16th section, or the companies relieved from investing their capital in the mode prescribed by their charters, or according to the requirements of the general law. They were made subject to the performance of these acts.

Until the certificate required by the 10th section was procured and recorded, a company organized under the act is not authorized to transact business, and when companies specially organized were brought under the provisions of the general law, it devolved on them to procure a similar certifi-

cate, and record the same, to authorize them to continue in business, and to relieve the shareholders from the liability imposed by the 16th section.

Having ascertained this to be the intention of the law makers, it devolves upon the courts to so construe the statute as to effectuate their intention. It is manifest that the same law which subjects companies organized under special charters to the duties and liabilities imposed by the general law, by implication imposes the same duties upon the Auditor, upon proper application of the company, to make the requisite examination, and give the necessary certificate if upon such examination the facts should warrant it. The company could, therefore, have required the Auditor to examine, or cause to be examined, the affairs of the company, and ascertain whether all of the capital had been paid in or secured, and invested as required by its charter or the general law, and if he so found, to give the requisite certificate, which could have been filed and recorded.

It would be useless to require this company to perform the acts necessary to organize a new company. If the shareholders had secured the balance of their subscriptions, or had paid it, and it was invested as required by their charter, that, under the exceptions in the 19th section, would be held payment and investment of the capital, within the meaning of the 8th section, and would require the Auditor to grant the necessary certificate, which could have been recorded as required.

We are aware that in the case of *Chase* v. *Lord*, 6 Abbott, (N. C.) 268, the New York Court of Appeals gave a different construction to a section of the Insurance law of that State. The section of that law is in some respects similar to the 16th section of our act. It is this: "The trustees and corporators of any company organized under this act, and those entitled to participation of the profits, shall be jointly and severally liable until the whole amount of the capital

raised by the company shall have been paid in, and a certificate thereof recorded as herein provided." It will be observed the language of the two sections is not the same, but it is not important at this time to determine whether their meaning is the same.

Under that law, a company was formed in that State, and for a time transacted business, and then failed. Before its failure, the company took a risk insuring a vessel and its cargo, which were lost. The assured thereupon sued the executor of one of the shareholders who had paid his stock in full, but a portion of the subscribers had not paid, nor had the certificate that all of the stock had been paid ever been procured and recorded. The circuit court held the executor liable, and rendered judgment against him, and he appealed to the Supreme Court, where the judgment was affirmed, and is reported in 16 Hun, 369: The case was taken to the Court of Appeals and the judgment was reversed by a bare majority, three of the judges dissenting.

That case is not a construction of the statute that is authoritative with us, as it was made subsequent to the adoption of our statute, and if ours is a copy of a provision of their statute, it is not binding on us. Again, including the judges of the Supreme Court, there were six judges who held the stockholder liable, and four who held the reverse doctrine. Again, on turning to the opinion of the Supreme Court and the dissenting opinion of the judges of the Court of Appeals, the reasons for their conclusions are, to our minds, more forcible than those in the authoritative opinion of the Court of Appeals. The number of the opposing and dissenting judges impairs the authority of such a decision.

It is said the declaration is insufficient. It avers, "that the whole amount of the capital of said corporation has never been paid in, and no certificate of such payment has been given or recorded as required by the statute of Illinois,

but, on the contrary, not more than one-half of said capital stock subscribed has ever been paid into said company." There is an averment that defendant had subscribed for fifty shares of the capital of the company. These averments are admitted by the demurrer. Each subscriber undertook and became liable by his subscription to pay the full amount in cash, and the 16th and 19th sections of the general law impose continued liability on all subscribers, whether they have paid in full or not, until all of the stock is paid, and a certificate thereof is obtained and recorded. If all of the stock of the company was not paid, and the certificate not obtained and recorded, there was a liability for the amount prescribed by the 16th section of the law.

The declaration in the case avers, and the demurrer admits, that no more than half of the capital has been paid into the company. Had it all been paid in, and invested as required by the charter or the general law, and the certificate been obtained and recorded, it may be the company would not have proved insolvent, and plaintiff would have been paid out of the funds the company should have had from the subscribers for its stock. At any rate, defendant and all other stockholders in the company would have been relieved from liability. The company no doubt procured credit on the supposition that all of the stock had been paid to the company, and was available to pay all liabilities of the company.

We are, for these reasons, of opinion, that the construction we have given to the 16th and 19th sections, on the facts stated in the declaration not overcome by a defence, renders appellee liable to pay the amount of appellant's claim against the company, and that the court below erred in sustaining the demurrer.

The judgment is reversed and the cause remanded.

*Judgment reversed.*

Mr. JUSTICE SHELDON, dissenting:

The general Insurance law of this State, which came in force July 1, 1869, contains the following sections:

"Sec. 16. The trustees and corporators of any company organized under this act shall be severally liable for all debts or responsibilities of such company, to the amount by him or them subscribed, until the whole amount of the capital of such company shall have been paid in, and a certificate thereof recorded, as hereinbefore provided."

"Sec. 19. All insurance companies heretofore organized in the State of Illinois, and now doing business in this State, are hereby brought under all the provisions of this act, except that their capitals may continue of the amounts and character named in and authorized by their respective charters, during the existing term of such charters, and the investments of the capital and assets of such companies may remain the same as prescribed by their charters, anything in this act to the contrary notwithstanding; and such companies shall also be entitled to all the privileges and powers granted by said charters." Rev. Stat. 1874, pp. 595–6.

The ground of the claim of the individual liability of the defendant for this debt against the company is, that the whole amount of the capital of the company has not been paid in, and a certificate thereof recorded, according to said section 16 of the general Insurance law. The claim of the liability is not under the charter of the company; there is no pretence that defendant has not paid his subscription for stock; but the claim is rested on this provision in section 16, and the provision in section 19, of the general Insurance law, which was passed subsequently to the charter and the organization of the company. On account of a reservation contained in an amendment to the charter, there is no question made by counsel as to the power of the legislature to impose this individual liability by this subsequent general Insurance law, if "corporators" is to be construed as includ-

ing stockholders; but the question is, whether it has done so. Section 16, of the general Insurance law, is a provision in reference to insurance companies which should thereafter be organized under that general Insurance act. Section 19 of the act brings all insurance companies theretofore organized in the State, and doing business, under all the provisions of such general Insurance act, except that their capitals might continue of the amounts and character named and authorized by their charters; that the investments of the capital and assets of such companies might remain the same as prescribed by their charters, anything in the act to the contrary notwithstanding; and that such companies should be entitled to all the privileges and powers granted by their charters. It is thus only in certain respects that already organized insurance companies are brought under the provisions of the general Insurance law, and the inquiry here is, whether in this respect of this provision of the law in section 16, the Germania Insurance Company has been brought under the general Insurance law. It has not—as is explicitly declared by said section 19—if thereby there would be interference with its capital continuing of the character authorized by its charter, with the investments of its capital and assets remaining the same as prescribed by its charter, or with the privileges or powers granted by its charter.

The charter is to be looked at, as it is made a public act, and the declaration makes it a part thereof. The charter of the company provides, that when the corporators and their associates shall have subscribed $100,000, and shall have paid in $10,000, and shall have secured the stock not paid in by certain enumerated securities, and have chosen certain directors and officers, the company shall be deemed fully organized, and enjoy the powers conferred by the charter. As the declaration avers that the corporation was organized under and by virtue of its charter, and had been in operation long prior to the passage of the general Insurance law, it

may be assumed that these conditions of the charter, as to the amount of stock to be paid in, and the giving of the required securities for the stock not paid in, had been complied with, the presumption to be indulged being, that the company was rightfully organized and rightfully doing business.

It being taken, then, that the required amount of stock had been paid in, and that the residue of the stock not paid in had been secured in the prescribed manner, the company had a franchise to do the business of fire, marine and life insurance. The securities for the stock not paid in formed a part of the capital stock of the company,—constituted a feature of the character of its capital. It was to all substantial intent and purpose an investment of the capital and assets of the company. It was, in effect, the same as if the subscriptions had been paid in and the money then invested in such securities, and, in my view, comes within the exceptions in said section 19 of the general Insurance law, as to bringing already organized companies under its provisions; that the capital of any such company might continue of the character authorized by its charter, and that the investment of its capital and assets might remain the same as prescribed by its charter. This would seem to be language framed with a view to just such a case as here presented. It was also a privilege to the company to hold and retain these securities as they were, and so the case may also be regarded as within the last and more general exception of the section, that the company should be entitled to all the privileges and powers granted by its charter.

There is every reason why there should have been exception of such cases. These assets of the company, its unpaid subscriptions, were secured by satisfactory securities, as is to be presumed. To what end should they have been required to be immediately collected in? It could not be for the purpose of having the money kept in hand, for the general Insurance

law itself authorizes the companies to be formed under it to invest their capital and assets in securities. By such collection, securities which were satisfactory would have been forced to be collected in, in order, as the general Insurance law authorizes to be done, to reinvest the proceeds in securities again. No such idle purpose could be attributed to the legislature, and the necessity of any such action was guarded against by the exceptions named.

Further, this provision in section 16 has no proper application to insurance companies already organized and doing business. It relates to insurance companies to be thereafter organized under that general Insurance law. The act made it a preliminary and a prerequisite to the commencement of business and issuing policies, by any company, that the whole amount of the capital of the company should have been paid in, and a certificate thereof from the proper officer be obtained and filed, the 10th section of the act providing, "which, [certificate] on being filed in the office of the clerk of the county where the company is to be located, shall be their authority to commence business and issue policies;" and the 16th section, under which the liability here is claimed, provides that until the whole amount of the capital of any company organized under that act shall have been paid in, the trustees and corporators of the company shall be liable for all debts or responsibilities of the company to the amount by them subscribed. But this company, by its charter, was authorized to commence business when $10,000 should have been actually paid in on the stock subscribed, and the residue of the subscriptions secured as by the act provided. Under this authority of its charter it was already, when the general Insurance law was passed, and for a long time before had been, rightfully doing business.

This provision in section 16, in relation to something to be done by insurance companies thereafter to be formed as an authority for them to commence business, would not properly

11—100 ILL.

apply to preëxisting companies which were already, and for a
long time before had been, rightfully doing business. The
latter needed no authority to commence business and issue
policies. They already had it. But it was future companies,
thereafter to be organized under the law, that were required
to have such authority to commence business and issue
policies, and until they obtained it the trustees and corpo-
rators were made subject to this liability imposed by this
16th section of the act.

: To repeat, in short: Previously organized companies,
under special charters, are in some respects brought under
the provisions of the general Insurance law. The bring-
ing them under such provisions is done entirely by the
19th section of the act; but this section carefully enu-
merates certain exceptions where such former companies
shall not be brought under the provisions of the act.
It does seem to me that the case of this insurance com-
pany, with the special provision of its charter for the in-
vestment of the unpaid portion of subscriptions in certain
enumerated securities, comes within these exceptions upon
any fair reading of language. To apply, here, the provision
in section 16 of the act, and make the stockholders in this
company liable for the debts of the company to the amount
of their subscriptions, until the whole amount of subscribed
stock of the company shall have been actually paid in, in
money, and a certificate thereof obtained and recorded, as
provided by the act, would, as I conceive, be in contraven-
tion of such exceptions that the capitals of such previously
organized companies "may continue of the amounts and char-
acter named in and authorized by their respective charters,
and the investments of the capital and assets of such com-
panies may remain the same as prescribed by their charters,
anything in this act to the contrary notwithstanding; and
such companies shall also be entitled to all the privileges and
powers granted by said charters." And it would seem, fur-

ther, as before said, that this provision as to the whole amount of capital being paid in, and a certificate thereof being obtained and recorded, which is made the authority for commencing business and issuing policies, is, in its nature, not properly applicable to preëxisting companies doing business under authority of law theretofore granted.

These, as I regard, are reasons sufficient, without looking further, for sustaining the demurrer to the declaration. There is no previous case of contrary import in this court which should have any binding force as a precedent.

In the case of *Butler* v. *Walker,* 80 Ill. 345, in denying the application for a rehearing, there was express reservation made that the grounds of the decision in that case might be reëxaminable in any subsequent case of the kind that should come before the court. The special provisions of the charter of the insurance company there, in respect of the authority for the taking of securities for the unpaid portion of its subscribed stock, were not at all considered or brought to the attention of the court in that case. Subsequent cases, until the present, but followed *Butler* v. *Walker,* there having been no raising or consideration of the questions in this case discussed. Not until now has there been a presentation or consideration of these questions.

Mr. CHIEF JUSTICE DICKEY dissenting:

I concur fully in the views presented by Mr. JUSTICE SHELDON, and will add some additional reasons why I think the judgment of the circuit court in this case was right, and ought to be affirmed.

I hold, first, that the 16th section of the act in question has no application to mere stockholders, even in a company organized under this act, but refers alone to the officials of such company,—the original corporators or promoters, and to their successors, the trustees or directors of such a company.

I hold, secondly, that (assuming the word corporators in section 16 to mean mere stockholders in a new company, and disregarding altogether the exceptions in section 19, on which Mr. JUSTICE.SHELDON very properly relies,) the words of section 19, wherein it is said: "All insurance companies heretofore organized in the State of Illinois, and now doing business in this State, are hereby brought under all the provisions of this act," were not intended to make the provisions of section 16 applicable to such old companies.

And, lastly, if this statute means that each of the stockholders in such old companies, although he paid in full for his stock and owed nothing for it to his company, should be personally liable to the extent of the par value of his stock for all debts of his company thereafter contracted, without the stock of others being all paid in, in cash, and so certified by the directors or officers of their company, although not contracted with the personal approbation of such stockholder, I hold that the General Assembly had no constitutional power to enact such a provision, and that the statute is not operative to sustain such a liability.

As to my first proposition, I concede that the word corporator is often properly, and perhaps usually, used to mean "a member of a corporation," and that in that sense stockholders are "corporators." The word corporators is, however, often used, and not improperly, in a more limited sense, meaning only those persons who are the original organizers or the promoters of a new corporation. I think it is in this, the more limited sense, this word "corporators" is used in this section 16 in its application to companies formed under this act of 1869.

To get the true meaning of any section of a statute it must be read with the context. Section 16, by its very terms, refers us to previous sections for its full meaning. It imposes on somebody a liability, until the whole capital shall have been paid in and a certificate thereof recorded, "as *hereinbefore pro-*

*vided.*" We must look to foregoing sections to find out what capital is to be paid in, and how it is to be paid in, and what certificate of such paying in is referred to, and how and where it is to be recorded, in order to avoid the liability intended to be imposed by this section 16. The liability mentioned by this section is plainly imposed as a penalty on somebody for the neglect of some duty. We must, therefore, look to foregoing sections to learn what these duties are, and upon whom these duties are by law imposed. It is a mistake to say that section 16 requires the paying in of capital, or the recording of any certificate. It does not purport to impose any duty upon any one. It merely imposes a liability for a neglect of duties referred to, "as hereinbefore provided,"—that is, for the neglect of duties imposed by the provisions of some clauses to be found in foregoing sections.

The following are all the words of the previous sections which can have any bearing upon any of the questions discussed in this case :

Sec. 1.   "Any number of persons, not less than thirteen, may associate and form an incorporated company," (to transact insurance business named in that section.)

Sec. 3.   "Such persons shall file in the office of the Auditor  *  *  *  a declaration, signed by all the corporators, expressing their intention to form" such a company, "which declaration shall also comprise a copy of the charter proposed to be adopted by them."

Sec. 4.   "The charter comprised in such declaration shall set forth the name of the company, the place" of the principal office, "the mode and manner in which the corporate powers granted by this act are to be exercised, the mode and manner of electing trustees or directors,—a majority of whom shall be citizens of this State,—and of filling vacancies ; but each director of a stock company shall be the owner of at least $500 worth of the stock of such company at its par value,

* * * and the amount of the capital to be employed in the transaction of its business." * * *

Sec. 6. "No joint stock company shall be incorporated under this act in the city of Chicago * * * with a smaller capital than $150,000, actually paid in, in cash, nor in any other county in this State with a smaller capital than $100,000, actually paid in, in cash. * * * No joint stock fire insurance company organized under this act, or transacting business in this State, shall expose itself to any loss on any one * * * risk in amount exceeding ten per cent of its paid up capital."

Sec. 7. "It shall and may be lawful for the individuals associated for the purpose of organizing any company under this act," (after filing certain papers and giving certain notices,) "to open books for subscription to the capital stock of the company so intended to be organized, and keep the same open until the full amount specified in the charter is subscribed."

Sec. 8. "It shall be lawful for any insurance company * * * incorporated under any law of this State, to invest its capital, * * * or any part thereof, in bonds and mortgages" (on property of a value prescribed), and also "in the stocks of this State, or stocks or treasury notes of the United States, and also in bank stock of national banks, and also in the stocks and bonds of any county or incorporated city in this State."

Sec. 10. "The charter * * * herein required to be filed * * * shall be examined by the Attorney General, and if found conformable to this act * * * shall be certified by him to the Auditor, * * * who shall thereupon cause an examination to be made, either by himself or by three disinterested persons specially appointed by him for that purpose, who shall certify, under oath, that the capital herein required of the company named in the charter * * * has been paid in, and is possessed by it in money, or in such

stocks·and bonds and mortgages as are required by the 8th
section of this act;   *   *   *   and the corporators and offi-
cers of such company shall be required to certify, under
oath, that the capital exhibited to those persons is *bona fide*
property of the company.  Such certificate shall be filed in
the office of the Auditor, who shall thereupon deliver to such
company a certified copy of the charter and of said certifi-
cates, which, on being filed in the office of the clerk of the
county where the company is to be located, shall be their
authority to commence business and issue policies; and such
certified copy of the charter, and of said certificates,   *   *
shall be conclusive evidence of the fact of the organization
of such company."

Sec. 11.   "The corporators, or the trustees, or directors,
as the case may be, of any company organized under this
act, shall have power to make such by-laws   *   *   *   as
may be necessary,   *   *   *   and the same, when necessary,
to alter and amend, and they and their successors may have
a common seal."

Sec. 12.   "It shall not be lawful for any directors, trustees
or managers of any insurance company to make any divi-
dend, except" (under certain conditions set forth in the sec-
tion).   "Any dividend made contrary to these provisions
shall subject the company making the same to a forfeiture of
its charter, and each stockholder receiving it to a liability to
the creditors of such company to the extent of the dividend
received, in addition to the other penalties and punishments
in such case made and provided."

Sec. 13, after certain provisions in relation to mutual
insurance companies, says:   "Every person effecting insur-
ance in any mutual company organized under this act,   *   *
shall thereby become members of said corporation during
the period of insurance.   *   *   *   The directors shall,
*   *   *   after receiving notice of any loss or damage by
fire sustained by any member, settle and determine the sums

to be paid by the several members thereof,   *   *   *   and the sum to be paid by each member shall always be in proportion to the original amount of his deposit note or notes. *   *   *   And if any member shall, for the space of thirty days   *   *   *   after notice upon such member,   *   *   * neglect or refuse to pay the sum assessed upon him,   *   *   * the directors may recover the whole amount of his deposit note;   *   *   *   but no member shall ever be required to pay for any loss   *   *   *   more than the amount of his deposit note."

Sec. 14.   "Every company doing business as a joint stock company shall, upon the face of its policy, in some suitable manner express that such policy is a stock policy."

Sec. 15.   "Suits at law may be maintained by any corporation formed under this act against its members or, stockholders, for any acts relating to the business of such corporation; and suits at law may be prosecuted   *   *   *   by any member or stockholder against such corporation."

A careful consideration of these previous sections shows the things to be done before any policies can lawfully be issued, and are in their order the following:   The thirteen promoters are (by the first section) to associate and form an incorporated company, with a view of acquiring lawful authority to issue policies of insurance.   This is done by agreeing upon and preparing a charter, and preparing and filing with the Auditor a declaration in writing (comprising a copy of the charter), signed by all the "corporators," (that is, by the thirteen original associates,) as provided in section 3. This charter must set forth, among other things, "the amount of the capital to be employed in the transaction of its business," and "the mode and manner of electing trustees or directors," as required in section 4.   When this declaration (comprising a copy of the charter) has been filed with the Auditor, thus signed by these original thirteen organizers, (called, in section 3, "corporators,") they are authorized, by

section 7, to open books for subscription to the capital, and keep the same open "until the full amount specified in the charter is subscribed." By section 6, this amount of capital must be at least $150,000 for a company to do business in Chicago, and at least $100,000 for a company to operate in any other county in this State, and before the enterprise is in readiness for an examination by the Auditor, all of this capital must, by section 6, be "paid in, *in cash*."

Up to this stage there are no duties prescribed to be performed by directors or by stockholders. After this capital is thus paid in, in cash, it may (by section 8) be invested by these thirteen original corporators, in part or in whole, in stocks and bonds, such as are set forth in that section.

At this stage of the proceedings, the affairs of the company still under the control of these original corporators, everything is ready for the final examination to be made under the direction of the Auditor. The charter, and proof of the publication herein required, having in the meantime been examined by the Attorney General, and found conformable to the statute, and so certified by him to the Auditor (as is provided in section 10), it is then the duty of the Auditor to cause an examination to be made. This may be made by three disinterested persons appointed by the Auditor for that purpose. Section 10 requires that the examiners, after having made their investigation, shall "certify, under oath, that the capital herein required of the company named in the charter * * * has been paid in, and is possessed by it in money, or in such stocks and bonds and mortgages as are required by the 8th section of this act." And the same section provides that "the corporators and officers of such company shall be required to certify, under oath, that the capital exhibited to those persons is *bona fide* property of the company."

It is thus shown that at the time of this examination the custody of the capital is still in the hands of the original

corporators, and their officers. From this it appears that they had power to appoint officers before there should be any directors. They would need a clerk or secretary to open the books and receive the subscriptions; they would need a treasurer, or other officer authorized to receive the cash, and safely keep it; they would need some executive officer or officers to invest the cash, or some part of it, if they chose so to do, in stocks and bonds, as authorized in section 8. That they had authority to make these investments, if they chose, is apparent from the fact that the examiners are not required to certify that the capital is possessed by the company in money or in cash, but the certificate required is, that it is possessed "in money, or in such stocks and bonds as are required by the 8th section of the act." That the act contemplates the appointment of officers before this time, is plain from the language of section 10, providing that the capital thus possessed is to be exhibited to the examiners by "the corporators and officers of such company."

The result of this examination being duly certified by two certificates to the Auditor of Public Accounts, it is made his duty to "deliver to such company a certified copy of the charter and of said certificates, which, on being filed in the office of the clerk of the county where the company is to be located, shall be their authority to commence business and issue policies; and such certified copy of the charter and of said certificates * * * shall be conclusive evidence of the fact of the organization of such company."

All things are now in readiness for the management of this business to be transferred from the hands of the original corporators into the care and custody of trustees or directors, and the next thing in order would seem to be the election of trustees or directors in the mode prescribed by the charter; and the trustees or directors being elected and qualified, the duties of the promoters, organizers or corporators (by whatever name known) *there* end, and the duties of trustees

or directors *there* begin.   The trustees or directors are the successors of the original managers, called sometimes "corporators."

In the transaction of the business required to be done by these thirteen promoters, or original organizers, or "corporators," there might be, and probably would be, a necessity for by-laws, to regulate the meetings of the promoters, to prescribe the duties of officers appointed by them, or for other purposes in connection with the collection of the tax, its safe keeping, its investment, and its exhibition to the examiners appointed by the Auditor.

After the directors or trustees assume control, other by-laws might be needed, or the by-laws already made might need amendment or alteration.   Accordingly it is provided in section 11, "the corporators, or the trustees or directors, *as the case may be*, of any company organized under this act, shall have power to make such by-laws  *  *  *  as may be deemed necessary for the government of its officers and the conduct of its affairs, and the same, when necessary, to alter and amend; and they and their successors may have a common seal, and may change and alter the same at their pleasure."

Attention is called to the words in the foregoing section, "as the case may be."   The provision plainly means that either the corporators or the directors, whichever may be engaged in the management of the business of the company for the time being, shall have power to make such by-laws, and the same to alter and amend.

By these provisions of the statute it is plainly made the duty of the original associates or corporators to take care that the capital of the company is all paid in, in cash, and a certificate thereof filed, before the management of the business is passed over to the hands of directors, and it is equally plain that it is the duty of the directors to take care that all this has been done before they enter upon the regular busi-

ness of the corporation, and before any policies are issued, for the 10th section of the act says, that such certificate, on being filed, "shall be their authority to commence business and issue policies."

Thus, we learn, that the capital mentioned in section 16, "as hereinbefore provided" to be paid in, is the amount of capital to be stated in the charter, as provided in section 4, and is that which, by section 6, is to consist of at least $150,000 for a stock company in Chicago; and is that which, by section 7, is required to be fully subscribed before the books for subscriptions are to be closed by "the individuals associated for the purpose of organizing any company under this act;" and is that which, by section 8, may be lawfully invested in bonds, mortgages and stocks described in that section; and is that which the examiners appointed by the Auditor are required, by section 10, "to certify, under oath, that" it "has been paid in and is *possessed* by" the company "in money, or in such stocks and bonds and mortgages as are required in the 8th section of this act;" and is that capital of which, by the 10th section, it is said, "the corporators and officers of such company shall be required to certify, under oath, that the capital exhibited to those persons" (the examiners) "is *bona fide* property of the company." We also find, as to the manner of its being paid in, that by section 6 it is to be paid in *in cash*.

As to the "certificate thereof," mentioned in section 16, it plainly means a certificate of the fact that the capital had been paid in, in cash. This must refer either to the certificate of the examiners to be made to the Auditor, or to the certificate of the Auditor, being a certified copy of the charter and of the certificate made by the corporators and officers as to the capital exhibited to the examiners, and of the certificate of the examiners,—that is, the document which is to be filed with the county clerk, and of which it is said, it "shall be their authority to commence business and issue policies." In my judg-

ment it is this final certificate which is referred to in section 16.

There is no express provision for the recording of any of these certificates, but I think by a fair construction the filing with the county clerk is to be taken to be the thing meant by the words, "and a certificate thereof recorded," found in section 16.

We find, also, that *the duties*—for the failure in the performance of which the penalty in section 16 is imposed—consist, first, of the duty to see to it that *all* the capital mentioned in the charter was actually paid in, in cash; and next, to see to it that the proper certificate thereof was filed with the clerk before any policies were issued. We find, also, that no part of these duties was imposed upon the mere stockholder, but we do find these duties are imposed upon the original thirteen organizers, and upon the trustees or directors.

From this review of the provisions of the foregoing section I am led to the conclusion that the liability imposed in section 16 for a failure to see that the capital is all paid in, in cash, and a certificate thereof recorded as thereinbefore provided, upon the trustees and corporators of any company formed under this act, was intended to be imposed upon the original associates, who had authority "to associate and form an incorporated company," and upon the trustees or directors who succeed them in the management, these being the only persons upon whom the previous sections had cast any duties in relation to the matter in question.

The chief object of this section 16 was evidently to furnish, in the organization of such new companies, additional safeguards that no policies should be issued until the capital had all been actually paid in, in cash, and so a penalty is provided, to be borne by those through whose wrong the general business should be begun in violation of law. If punishment is to be imposed for a default, it must be taken (unless the contrary is expressly declared or shown by clear and necessary

implication) that the punishment is to be imposed upon the persons in default, and not upon those who have no duty imposed upon them in relation to the matter to which the penalty relates.

The original corporators, whose duty it is to receive the capital in cash and procure the final certificate from the Auditor, necessarily know whether these duties have been performed. The trustees or directors, when they take charge of the capital, receiving it from the corporators, have the means of ascertaining whether the capital has been in fact all paid in, and whether the necessary final certificate has been procured and filed with the county clerk. When they receive the custody of the capital from the corporators, they can examine the cash, and the investments, if any part of it has been invested in stocks or bonds. If they go on without knowing that all this has been done, and that it has been so certified, it is reasonable that they should be made responsible, until the affairs of the company are put in the condition required by the statute. But it is not reasonable that a man who has merely subscribed for certain shares of stock, and has paid in the cash for such shares, should be thus charged, when he has neglected no duty imposed upon him by law. It is true, he might look in the clerk's office and see whether the certificate required has been filed, but such is not usually regarded as the duty of a mere stockholder. He may have the right to inspect the books, but he has no right to count the money in the safe, so as to determine whether or not all other stockholders have in fact paid in their dues.

There is another reason which leads me to think that the word "corporators," as used in section 16, is not intended to mean stockholders. This word "corporators" is used in many parts of this statute, and in no instance, in any provision in relation to a stock .company, is this word "corporator" used to mean stockholder, unless it be in this section 16, and in many parts of the act provisions are found which do relate

to the mere owners of stock in a stock company, and in *every* instance where mere shareholders are spoken of they are designated as "stockholders." They are spoken of by that designation in twelve different places in the act, and mere shareholders are not mentioned in any part of the act by any other description, unless it be by the term "corporators," as found in this section 16. If my construction of the meaning of the word "corporators" in section 16 be right, it will then be found that the word "corporators" in this act, in every single instance, is used to mean the original associates or promoters of a new corporation, and is nowhere used in the act in any other sense. It is also true, that wherever in the act reference is had to a mere member of a corporation, if the reference relates to a stock company, they are everywhere called "stockholders," and where the reference relates to a mutual company, they are everywhere called "members of" the corporation.

My construction of the meaning of this word "corporators" is fortified by the decision in the case of *Chase* v. *Lord*, 6 Abbott, (N. C.) 268, made by the court of last resort in the State of New York,—the Court of Appeals.

Our statute of March 11, 1869, is plainly modeled after the statutes of New York, in force at the time of its passage. In fact, most of its sections, and clauses in nearly all of its sections, are copied *verbatim* from the statutes of New York. In New York the comptroller performs the duties imposed on the Auditor by our statute. In New York only a given portion of the capital of joint stock companies is required to be "*raised*" in cash before the commencement of ordinary business. By the statute of New York there is a preliminary inspection by examiners appointed by the comptroller, and a *filing* of certificates as required in our statute. In the sections directing the mode of organization, in their statute, as in ours, there is no express provision directing any certificate to be *recorded*. In New York the statute has a section say-

ing: "The trustees and corporators of any company organized under this act   *   *   *   shall be jointly and severally liable until the whole amount of the capital *raised* *   *   *. shall have been paid in, and a certificate thereof *recorded* as hereinbefore provided."

It will be observed that we have copied even the blemishes of the New York statute, by speaking of a recording as being "hereinbefore provided," when in neither statute is anything but filing spoken of in the previous sections.

It was sought in *Chase* v. *Lord, supra,* to charge a *stockholder* of a company formed under their general statute with a debt of the corporation, incurred when the whole of that part of the capital required to be paid in, in cash, or "raised," had not been so paid in. The Court of Appeals held that the word "corporators," in their statute, did not signify "stockholders," and said: "The corporators are the associates who are the getters up of the company, and whose functions cease with its organization.   *   *   *   Corporators exist before stockholders, and do not exist with them. When stockholders come in, corporators cease to be. Corporators are liable if they launch the company without complying with the law."

Now, what are the reasons suggested for a different construction of the word corporators in this section 16? It is first said, that the constitution of 1848 (in force when this act of 1869 was passed) declares, that "dues from corporations   *   *   *   shall be secured by *such* individual liabilities of the corporators, or other means, as may be prescribed by law;" that this constitutional requirement operates as an imperative command on the General Assembly; that being under this obligation, that body endeavored to discharge the duty *thus imposed;* and it is argued, that liability of promoters (or corporators, in the sense I understand this term to have been used,) would be very inadequate security for the vast dues from corporations; and hence the General Assembly,

it must be assumed, used this term in the broad sense of stockholders.

This argument takes no notice of the words, "or other means, as may be prescribed by law," found in that clause in the constitution. The mandate of the constitution is not that such dues shall be secured by individual liability of the corporators, "but by *such* individual liabilities of the corporators, or such *other means,* as may be prescribed by law." By this provision of that constitution the General Assembly is commanded to provide by law for the securing of dues from corporations. This is the mandate. The clause contains a suggestion that this may be done "by *such* individual liabilities of the corporators as may be prescribed by law, or by such other means as may be prescribed by law." This mandate and these suggestions the General Assembly fully recognized and strictly obeyed in passing this general Insurance act. To prevent the issuing of policies before the capital should be all paid in, in cash, and so certified, it provided that the managers thus violating the law should be liable to the limit of the amount of their stock. Thus a cash capital was insured, and to provide against loss by improvident investments, the 8th section directs in what bonds and stocks this capital may be invested; and by the last clause of the 6th section such companies are forbidden to expose themselves, upon any one risk, to the chance of a loss of over ten per cent of their paid up capital; and section 12 forbids the making of dividends where the making of the same can injure the creditors, and imposes upon all *stockholders* receiving any such forbidden dividends, a liability to the creditors to the extent of the dividend received by them respectively; and by section 21 the officers are required to make annual reports to the Auditor of the condition of the financial affairs of the company, showing, first, the capital stock of the company actually *paid in;* second, the property and assets held by the company, specifying in detail the nature and amount and

value of each kind of property so held, under twelve different heads; third, the liabilities of the company, specifying each in detail, as therein stated, under seven different heads; fourth, the income of the company during the preceding year, specifying the source of such income, under four different heads named in the clause; fifth, all expenditures within the same year, specifying in detail the nature, amount and purpose of each expenditure. By the same section the officers of such corporations are required to promptly reply to any inquiries made by the Auditor in relation to its doings or condition, or *any other matter connected* with its transactions, and this duty is enforced by heavy penalties for neglect. By section 23 it is made the duty of the Auditor to examine, from time to time, in person or otherwise, whenever he shall deem it expedient, into the affairs of such companies, with full authority to inspect the books and the assets, and to examine, under oath, any officer of the company touching the affairs or condition of the company, and when the public interest requires, the Auditor must publish the result of such investigation; and if, whenever the assets are insufficient in value to render it safe to permit the company to continue business,—unless the stockholders will come forward with enough to make good such deficiency,—the business is to be closed, and the affairs wound up under the direction of the courts. Other safeguards, calculated to secure dues from such corporations, are found in the act, not here mentioned.

If the word "corporators," in section 16, shall be held to mean the first managers of the company, and not to mean and embrace mere stockholders, can it be said, with any reason, that such construction would convict the General Assembly of a failure to prescribe by law, as commanded by the constitution, security for dues of corporations, by any liability of the shareholders, or by any other means? I think not. Shareholders in other parts of the act are subjected to

certain "individual liabilities," and "other means" in abund-
ance are prescribed for the purpose in question.   When the
General Assembly has so met the behests of the constitution,
this court can not, as I think, properly say they have not
done their full duty; nor can it properly supply any supposed
default in that branch of the government by stretching one
of its enactments beyond its true meaning, by (what seems
to me to be) unwarrantable construction.   I derive no light
on this question from this reference to the constitution.

Section 11 says: "The corporators, or trustees, or directors,
*as the case may be,*    *    *    *    shall have power to make
such by-laws    *    *    *    as may be deemed necessary for the
government of its officers and the conduct of its affairs, and
the same, when necessary, to alter or amend."   It seems to
me a mistake to say of this section, "manifestly corporators
here mean shareholders."   I think the word "corporators"
in section 11 means the original associates, and not share-
holders.   I call attention to the words, "as the case may be."
This phrase necessarily implies that by-laws may be made
or amended in the early stage of the business, when the
corporators or promoters have the custody of the books and
assets, or at a later stage of the business, when the manage-
ment is in the hands of trustees or directors chosen in
such manner and at such time as the charter prescribes.
So this section 11 provides that by-laws may be made, or
amended, or altered by the corporators, or by the trustees
or directors, "as the case may be,"—that is, in case the
corporators are in the management, then by the corporators,
and in case the affairs have been turned over to trustees or
directors by the original corporators, then the by-laws may
be made or changed by the trustees or directors, and
hence the words, "the corporators, or the trustees or directors,
as the case may be."

I think, too, it is a mistake to say a corporation, under
this act, can not be liable for expenses preliminary to the

getting and filing its final certificate, constituting the authority of its directors and officers to commence business and issue policies.   Under this act, I think that as soon as the articles of association, containing a copy of the charter, is signed by the associates, or by all the corporators, they become a body politic, capable of making all the contracts and incurring all the liabilities incident to the obtaining of the right or lawful authority to issue policies.   This is manifest from the language of the 10th section, in connection with the provisions of section 8.   By section 10, when the examiners are appointed by the Auditor to examine the capital, it is said, they "shall certify, under oath, that the capital herein required of the company named in the charter has been paid in, and is possessed by it in money, or in such stocks and bonds and mortgages as are required by section 8 of this act; * * * and the corporators and officers of such company shall be required to certify, under oath, that the capital exhibited to those persons (the examiners) is *bona fide* property of the company."   Looking at section 8, provision is found making it lawful for such company to invest its capital, or any part thereof, in certain kinds of stocks, or bonds and mortgages.   It is thus shown that it is assumed in this statute that before the Auditor's examiners come to inspect, there is a corporation capable of owning money and property, and a corporation which has had before that time the capacity to receive money and invest it in stocks and bonds.   To do this it must have had some officers or agents capable of acting for this corporation, and of incurring any and all liabilities, debts and responsibilities necessary to the attainment of the object of the association.   I think, for all such purposes, "the associates" become a corporation the moment the articles of association are signed by the corporators.

Chief Justice SHAW, in *Gray* v. *Coffin*, 9 Cush. 199, said: "To create any individual liability of members for the debt of a corporation * * * is a wide departure from estab-

lished rules of law,   *   *   *   and depending solely upon provisions of *positive* law. It is, therefore, to be construed strictly, and not extended beyond the limits to which it is *plainly* carried by such provisions of statute."

Can it reasonably be said, in view of all the provisions of this statute, that it appears plainly from the provisions of this statute that it was the intention to impose this penalty upon the mere stockholders?

My second proposition is, that even if the word "corporators," in section 16, be held to mean "stockholders" in a corporation organized under this general act, still, the provisions of section 16 are not made applicable to companies organized before the passage of that act, and doing business properly under their charters. In other words, the provisions of section 19 (even if that section did not contain the exceptions on which Mr. Justice SHELDON very properly relies) were not intended to, and, taken without the exceptions, do not, upon fair construction, render the provisions of section 16 or of section 10 applicable to such old companies.

Chief Justice MARSHALL, in *Woods* v. *Adams*, 2 Cranch, 341, said: "General expressions may be restrained by subsequent particular words, which show that in the intention of the legislature those general expressions are used in a particular sense."

Section 19, as to these old companies, says, they "are hereby brought under all the provisions of this act." These are the talismanic words on which the plaintiff in this case relies. These words do not make every provision of the act applicable to old companies. It is one thing to be brought under the laws of a country, and it is quite another thing to have all such laws *made applicable* to the person or corporation thus brought under such laws. Every man coming into a State to reside is "brought under" all the laws of such State, but all the provisions of such laws are not thereby made applicable to him. If he be a farmer, statutes as to

safeguards provided for the safety of laborers in mines can have no application to him. If he be of full age, statutes as to minors can have no application to him. If, then, section 16 imposes a liability on stockholders of a corporation which is to be organized *under that act*, and such corporation is not to be allowed to transact the business of issuing policies until the provisions of section 10 and of section 6 of that act have been complied with, it by no means follows that sections 10 and 6 or 16 are to have any application to the stockholders of a company not organized under that act, and which was not required by any provision of law to comply with the provisions of section 10 or of section 6 of that act.

It is not, however, claimed, as I understand it, by the plaintiff in this case, or held by the court, that *all* the provisions of this act can properly be regarded as made applicable to then existing companies. It is not claimed that a then existing company was required to have its stockholders, or members, or officers "associate and form an incorporated company," as provided in section 1; or to file with the Auditor a declaration comprising a copy of the charter "signed by all the corporators," as required by section 3; or to change the amount of its capital so as to conform with the requirements of section 6; or to comply with section 7 by opening books for stock subscriptions; or to comply with the provisions of section 10, as to having its charter examined by the Attorney General, and duly certified by him to the Auditor. If all this be so, by what reasoning or authority can it be said that these general words of section 19 did make applicable to a then existing company the other provisions of section 10, requiring that the capital of such companies should be exhibited to examiners appointed by the Auditor, and requiring the filing of certificates that the capital had "all been paid in," and was then "possessed" by such companies "in money, or in stocks" and bonds, as provided in section 8? There is no intention expressed in the act of 1869, or else-

where, to require that this should be done. There is no provision in the charter of this company requiring that it should be done. There are provisions found in this statute stating expressly under what circumstances the provisions of section 10 may be made applicable to a then existing insurance company. By section 17 it is enacted, that "any existing joint stock fire insurance company, heretofore incorporated under the laws of this State, * * * having a capital of at least $100,000, may, without increasing its capital, at any time within two years previous to the termination of its charter," by giving notice and making a declaration of such intention, "signed by the president and two-thirds of its directors, of their desire for such extension, extend the term of its original charter, * * * by altering and amending the same so as to accord with the provisions of this act, and filing a copy of such amended charter, with the declaration aforesaid, in the office of the Auditor of Public Accounts; whereupon the *same proceedings shall be had* as are required *in the 10th section* of this act." It is also provided in the 18th section, that "any existing fire insurance company * * * may, at any time, increase the amount of its capital stock," upon giving certain notice of such intention, "with the written consent of three-fourths in amount of its stockholders, * * * by altering and amending their charter in this respect, and by filing a copy of their charter, so amended, together with a declaration under its corporate seal, signed by its president and directors, of their desire so to do, * * * in the office of the Auditor of Public Accounts, and upon *the same proceedings* had as are required *in the 10th section* of this act."

It would seem that, inasmuch as this statute has expressly provided for the cases in which a then existing company may be required to conform to the proceedings required in the 10th section of the act, it should be inferred that then existing companies were not understood to be required to conform to

any of the provisions of this 10th section, except in the cases thus expressly pointed out. The expression of the one is the exclusion of the other. I can find no warrant for saying that section 19 was intended to require any then existing company, except upon its own will, to conform to any of the requirements of section 10.

I confess that I am unable to understand exactly with what provisions of this general act then existing companies are held, by this court, to be required to comply. It is said in substance, that this company, by its charter, was authorized to invest its capital in certain stocks and in certain bonds and mortgages, and that under this act, "if its capital was thus invested, * * * it could so remain." And again, "if the stock was paid in and invested as authorized by the charter, the 19th section in terms permits it to so remain, unaffected in the slightest degree." And again it is said, if the capital of this company had been invested in the securities mentioned in the charter, "that investment was protected, and nothing further was required to be done in regard to the investment of the capital."

On the other hand it is said, "it seems to have been one of the obvious purposes of the statute to require the entire capital to be paid in and invested in the manner prescribed by the 8th section, where companies are organized under the act, * * * and if acting under a special charter, that the capital should be paid and invested as required by *its provisions,* as a condition to its continuing to do business." And again it is said, "it was intended that such companies should conform their business, pay and invest their capital," as required by the general law.

Now, the capital of this Germania company, we must infer from the pleadings in this case, had been paid up in cash to the extent required by its charter, and the residue of its capital consisted of stock notes, secured in the manner required by its charter, and its moneys were invested in the class of

securities that were prescribed by its charter. If so, then "the stock was paid in and invested as authorized by the charter," and it is conceded that "the 19th section in terms permits it to so remain, unaffected in the slightest degree." And it is said, "if so, that investment was protected, and nothing further was required by the act to be done in regard to the investment as capital." Now, how can this be, if it is "the obvious purpose of the statute to require" of companies acting under a special charter "that the capital should be paid and invested as required by" the provisions of section 8, "as a condition to its continuing to do business?" or, if "it was intended that such companies should conform their business, pay and invest their capital," as required by the general law?

How can the stock of this company, paid in and invested as authorized by its charter, remain unaffected in the slightest degree, and how can such investment be protected, and nothing further required by the act to be done in regard to this investment, if at the same time this statute requires that the capital shall be paid and invested as required·by the provisions of section 8? The provisions of section 8, and the provisions of the charter of this company as to investments, are not identical. If the capital of this company is required by the statute to be all paid in and invested in the securities named in section 8, it would be necessary that the present investments should not remain, but that they should be converted into the securities specified in section 8.

It seems to me that if the General Assembly had intended to provide by this statute that all then existing insurance companies acting under special charters should at once suspend business and issue no further policies until, if the capital had not all been paid in, in cash, each subscriber had been required to pay up his subscription in cash, and that the same should be reinvested in securities prescribed in section 8 of this act, and that then, after the investment was

thus made, whether in conformity to the 8th section of the general law, or in conformity to the charter of the company in question, should, before proceeding to issue policies, procure the appointment of examiners, submit their capital to examination and investigation, and otherwise comply with the provisions of section 10 of this act, some means or specific mode or process would have been pointed out in the statute by which this end should be accomplished. The stockholders of such corporations were very numerous, and the residence of many of them, no doubt, very remote. If it were required that the officers of the company and the stockholders of the company should exhibit the capital of the company to such examiners, and certify under oath that this capital is *bona fide* property of the company, it would be a wonderful tax upon the stockholders of such corporations, and it is difficult to conceive how each stockholder could have the necessary knowledge of the details as to the condition of the company to enable him to swear that the capital exhibited is *bona fide* property of the company. If the General Assembly intended to produce a revolution so radical, it would certainly have made a specific declaration to that effect, and would not have left it to implication.

In answer to a suggestion of this kind it is said, "the means, we think, are 'ample and easy of application' to enable then existing companies to 'procure and record the certificate required by the 16th section.'" In this connection it is also said, as to such then existing companies, that "under the 10th section they were required to make a report to the Auditor of the fact of their organization, and amount of capital paid in," etc.; and that "it would thereupon have become his duty to have examined in person, or by three persons he is authorized to appoint, the amount of the capital stock paid in, and whether any portion was unpaid, and whether it was invested as required by the charter or the provisions of the general law, and if found to be all paid

in and invested, and actually owned by the company as required, then to give a certificate of *the fact,* as required by the 10th and 16th sections, which could be recorded as required." It seems to me this is wholly unwarranted, having no support in the words of the statute. I have read again the 10th section of this statute with care, and I find no provision in that section whatever requiring any company, whether new or old, to make a report to the Auditor of the fact of their organization and the amount of capital paid in, and I can not conceive upon what authority it can be said that "under the 10th section they were required to make a report to the Auditor" of that character, or, in fact, any report at all. The examiners, in dealing with the original corporators of new companies, are required to certify, under oath, "that the capital required of the company named in the charter has been paid in, and is possessed by it in money or in stocks," etc., "as are required by the 8th section of this act." And the corporators and officers of such company are required to certify, under oath, that the capital exhibited to those persons is *bona fide* property of the company. If corporators here mean stockholders, and if section 10 be applied to them, it involves, as I have suggested, if applied to old companies, the necessity of gathering all of the stockholders from all parts of the country to witness the exhibition of the capital, and to swear that it is *bona fide* property of the company. Nor is the Auditor required by section 10, either in the case of a new company or an old company, to give a certificate of the fact that the capital was "all paid in and invested, and actually owned by the company." The requirement on that subject is, in the case of a new company, that he shall "deliver to such company a certified copy of the charter and of the said certificates," (meaning the certificate of the examiners and the certificate of the corporators and officers); but neither section 10 nor section 16 provides for a certificate by the Auditor of this

kind, or of any kind pertaining to this subject, to be made by the Auditor in relation to a then existing corporation.

It is said old companies are brought under only such provisions as are "practical," or may practicably be applied to them. It is expressly conceded that such companies need not comply with the provisions of sections 1, 3, 4, 6, 7 or 8, or to the provision in section 10 requiring charters to be submitted to the Attorney General for approval, because, as is said, none of these things are necessary or practicable. It seems, by implication, to be conceded that the provision requiring the "corporators" to certify to the Auditor the title of the company to the capital exhibited to the examiners, need not be observed, and that it is not necessary for the Auditor to give a "certified copy of the charter," and of the certificate of the examiners and that of the corporators, as prescribed in section 10; and this, I suppose, because it would not be practicable or necessary. But it is suggested that, instead of conforming to these provisions, another course, not pointed out in the statute, might be adopted, and it is for not conforming to that course (not provided in the statute, but now for the first time suggested,) that judgment must go against these stockholders. This course, in short, as suggested, is to consist in a report to the Auditor, at once, by the officers of the company, of the fact of the organization of such company, and of the condition of the capital and assets, and then an examination by persons appointed by the Auditor, and a report by the examiners to the Auditor, and then to have the Auditor "give a certificate of *the fact*, as required by the 10th and 16th sections, which could be recorded as required." Such a certificate would not be worth a rush. The certificate of an officer to *a fact* is not even *prima facie* evidence of such *fact*, unless he has express statute authority to certify such fact. Neither section 10, nor section 16, nor any other statute, requires or authorizes the Auditor to certify to the fact that

the capital has all been paid in.   The only certificate required of the Auditor or authorized by statute relating to this subject, is "a certified copy of the charter and of said certificates"—meaning the certificate by the corporators and officers of the company, and the certificate of the examiners to the Auditor.   This kind of certificate, as I understand, is considered impracticable, for the reason, as I suppose, that it would be impracticable to get the certificate under oath of the corporators, so that the Auditor could give a certified copy of the same.

If we are allowed to say that conformity to sections 1, 3, 4, 6, 7 and 8 is not required, because it would be impracticable, we should be allowed to say the same as to compliance with section 10.   There is no authority for us, or any one else, to invent a substitute and prescribe it as law. The idea that then existing companies, organized under special charters granted by this State, were all intended by the General Assembly to be compelled to stop business, make a report to the Auditor and ask examination, and gather all their stockholders to be present and verify the exhibit of paid in capital, and get a special kind of certificate of its condition, and record the same, before they could resume business, is repelled by other provisions of the act. The act went into force. March 11, 1869.

As already mentioned in another connection, section 21 provides that each company, new and old, formed under laws of Illinois, should, in January of each year, deposit in the office of the Auditor a statement, sworn to by its officers, of the condition of such company on the 1st of December then next preceding, exhibit the facts and items in minute detail, as set out at large and in detail in that section; and the Auditor is then authorized to probe the truth by cross-examination through specific questions, to be answered promptly by the officers, under heavy penalties.   And section 23 authorizes the Auditor, at any time, in person or by one or

more examiners appointed for the purpose, to examine the affairs of such company, with the right to examine books and assets, and to examine the officers under oath. Section 32 says the examination of companies already organized under laws of this State shall, for 1869, be made in the month of July, 1869. And section 26 provides expressly that foreign companies doing business in this State, having certificates of authority for 1869, might continue to transact business of insurance, without further statement, until the 31st of January, 1870.

Can it be believed that it was the policy of the General Assembly, that on the 11th of March, 1869, every organized company should stop business at once, and lie idle until it could get a new license to go on, in the way suggested in the opinion of the court in this case, when the examination of each was to be made within four months of that time, and at the same time permit foreign companies doing business in this State to keep right on in business upon their old licenses until January, 1870? I think not.

Again, new companies formed under this act, all agree, can not lawfully have any stock notes on hand, for their capital was all to be paid in, in cash, and with them there could be no stock notes. If, by section 19, old companies are put on the same basis, they could do no business lawfully until their capital was also all paid in, in cash, and, of course, they could have no stock notes. Now, section 21, speaking of the statement to be annually returned to the Auditor by every Illinois company, says: "The statement of any company, the capital of which is composed in whole or in part, * * * shall in addition exhibit the notes *originally* forming the capital, and also what proportion of *said* notes" is still held by such company and considered capital. Notes originally forming a part of the capital can be none other than stock notes,—notes given by stockholders to the company for the part of their stock not paid in, in cash. So it appears that

it was contemplated by the statute that some of the companies formed under the laws of this State should lawfully continue to do an insurance business without having all their capital paid in, in cash, but might continue business with part of their capital still remaining in stock notes. Again, in this section 21, there are enumerated twelve classes of assets, in relation to which an annual report to the Auditor is required. The ninth class requires a statement in this annual report of "the amount of assessments on stock or premium notes, paid and unpaid, specifying each." If, as is contended, the capital of all such companies, old as well as new, was to be paid in, in cash, before any more business should be done, there could not lawfully be any stock notes on which to make assessments.

My view of the meaning and effect of the words of section 19, under consideration, is, that it was intended thereby to make applicable to then existing companies all the provisions contained in this statute which relate to the mode of conducting business by a company having full authority to enter upon an insurance business and to issue policies; and that it was not intended to make applicable to such old companies any provision of this statute made prescribing the thing to be done by the corporators of a new company, and by the public officers, in order to clothe the new company with power and authority to commence an insurance business and issue policies. This view of the subject is warranted by the fact (which may be seen by an examination of the act) that every part of the provisions relating to the mode of organizing new companies under the act, and putting them in a condition to lawfully commence the issuing of policies, and every clause in the act which relates to duties to be performed in the commencement and organization of a new company before it shall be lawful for it to commence business and issue policies, are limited in their application, either absolutely, by the nature of their provisions, or by express words on their

face, to companies "organized under this act," or "to be organized hereafter;" and that, on the other hand, no one of the clauses of the act which relates to duties to be performed in the management of the affairs of a company, after it is authorized to issue policies, is limited on its face, in terms, to new companies, and every one of such clauses is either silent as to the class of companies to which it applies, or else by its terms, upon its face, is made to embrace then existing companies. The fair inference is, that although old companies are brought under all the provisions of this act, yet none of these provisions are to be considered applicable to old companies which, on their face, and by their very words, are expressly limited in their application to companies to be formed under the act, or to be hereafter formed.

When, therefore, we find that section 16, by its very terms, relates only to companies "organized under this act," and that the duties alluded to in that section as hereinbefore provided, are duties prescribed in sections which by their terms are confined to new companies, and are duties which are to be performed in the organization of the new company before it can lawfully issue policies, the inference is irresistible that section 16 was not intended to be made applicable to then existing companies, in any sense whatever.

It is a well recognized rule of construction that where there are general words in the statute, and at the same time there are special provisions in the same statute that seem inconsistent with the general words when literally construed, the special provision shall prevail, and the general provision shall yield to that extent. The words in section 19 are broad and general wherein it speaks of all the provisions of this act. The words of section 16 are express in confining its application to companies formed under this act. By this rule of construction section 16 has no application to companies existing and doing business at the time of the passage of the act.

If, therefore, there are no qualifying words attached to section 19, by way of exception or limitation, it seems to me plain that the declaration in that section, saying they "are hereby brought under all the provisions of this act," ought not to be construed as so far amending their charters as to require them to comply with the provisions of section 10, as to what must be done to accomplish a full, lawful organization by a new company formed under that act. When the qualifying words discussed by Mr. Justice SHELDON are considered in support of the same conclusion, the argument, to my mind, is irresistible.

I am forced to the conclusion that it was the intention of the General Assembly, by the passage of the act of March 11, 1869, to prescribe, as to new companies, a mode of organization, with a capital full paid, in cash, before they should begin to issue policies, and to establish police regulations for them in the management of their business afterwards, which should protect the public from imposition; and that as to old companies, it was intended to make applicable to them all such police regulations as to the conduct of companies having lawful right to issue policies, and it was not the intention to apply to these old companies any of the requirements provided as to new companies to enable them to get lawful authority to issue policies, for the old companies possessed that lawful authority by their charters. Any other construction seems to me to be, in the language of Chief Justice SHAW, *supra*, extending the meaning of this statute "beyond the limits to which it is plainly carried by the provisions" of the same.

Lastly, suppose this statute had declared, in so many words, that "all existing insurance companies shall at once suspend business until all its capital shall be paid in, in cash, and until the same shall be found by the Auditor on examination to have been so paid in, and until a certificate by the Auditor to that effect shall have been filed with the

county clerk, and by him recorded; and if any such company shall hereafter incur any debts or responsibilities before such capital stock is all paid in, in cash, and a certificate thereof filed and recorded, as herein required, each stockholder of such company shall be liable for such debts and responsibilities to the amount by him subscribed, whether he has or has not paid in full, in cash, for his own stock, although he may not have consented to or aided in the making of such debts and responsibilities in any way, except by simply being the owner of the stock subscribed by him,"—in such case I hold the provision charging such stockholder would have been unconstitutional, inoperative and void. It may be conceded, that under the power to amend the charter the General Assembly might require such companies to comply with such a provision, and might punish a violation of such provision by a forfeiture of the charter, and even by the forfeiture of all the corporate property and capital. It may be conceded that by becoming a member of the corporation the stockholder entrusted the care and management of his interest in the charter and in the capital of the company to the directors and officers, and to that extent agreed, by his contract of subscription, to give, and so gave, them the power to destroy the value of his stock and his interest in the property or capital of the company. But all this falls far short of putting it in the power of the officers of the company to take or charge any part of the residue of his estate, and far short of clothing the General Assembly with legislative authority to put it in the power of the directors to render the rest of the stockholders' estate liable to forfeiture, or liable to be taken or charged to any extent whatever. When power to amend a charter of a corporation is given or reserved to the legislature, it does not imply power to confiscate any part of the estate of the mere stockholder not invested or agreed to be invested in the capital of the corporation, unless it be by way of punishment for some violation of law done by the

stockholder himself, or with his aid, advice or consent. The
law makers can not punish one man for the offence solely
of another. I deem it sufficient to call attention to these
elementary principles, without offering any argument or
authority at present in their support.

Subsequently, an application for a rehearing was made,
and denied.

Mr. JUSTICE DICKEY,* dissenting to the order denying a
rehearing:

I can not concur in the order of this court denying a rehear-
ing, as sought by appellee. My views were given at large on
this subject when the judgment of this court was rendered
reversing the judgment of the circuit court.

In refusing the petition for a rehearing, this court has
taken occasion to modify the opinion of the court originally
filed, so as to change, in some respects, the argument therein
presented in support of the judgment. This change renders
some things said by me in my former opinion superfluous,
and perhaps inapplicable to the case as now presented.

In the opinion, as originally filed, the position was taken
that section 10 of the act contained provisions requiring
companies formed under the act "to make a report to the
Auditor of the fact of their organization, and amount of cap-
ital paid in," etc., and that this provision, by section 19, was
made applicable to old corporations, and thus furnished the
mode in which old companies could comply with the require-
ments of section 16. It was also said, it was the purpose of
the statute to require of new companies that as a condition
to beginning business the entire capital should be paid in,
and invested as required in section 8 of the act; and of old

---

*At the time of filing his dissent to the governing opinion in this case
Mr. Justice DICKEY was Chief Justice, as there designated, but at the Sep-
tember Term, 1881, when his dissent to the order denying a rehearing was
filed, the Hon. A. M. CRAIG was the Chief Justice.

companies, that as a condition to continuing business the capital should be paid, and invested as required by their respective charters. The opinion as modified omits the above statement as to provisions contained in section 10, and contains no statement as to what section 10 does require. But section 21 is referred to as imposing upon old companies the duty to report to the Auditor the condition of these companies on the first day of January of each year, giving the amount of capital paid in, in what manner invested, together with other information, and it is added: "from this it is clear that in these several respects the intention was to place both classes on precisely the same footing," and from this it is inferred that old companies, from the passage of the act, were to stop business until their entire capital should be paid in, and a certificate thereof made by the Auditor, and duly recorded. I grant that "in *these several respects,*" (that is, in respect to the several matters named in section 21,) it was the intention to place old and new companies upon the same footing. In fact, as heretofore stated, section 21, by its own terms, is made applicable to "each company organized under this act or incorporated under any law of this State."

Examining the contents of section 21, it is found it relates exclusively to matters to occur after the company in question is authorized to go on with its business, and has no reference whatever to anything to be done before beginning business or before continuing business. And as I said before, several of the items to be reported show that such companies were not *all* expected to have all their capital paid in, in cash, for some of them were to report every January "the amount of assessments on stock notes paid or unpaid;" and in this same section 21 it is said: "The statement of any company, the capital of which is composed in whole or in part of notes, shall exhibit the amount of notes *originally forming the capital,* and also what proportion of *said notes*" (that is, original stock notes,) "is *still held* by said company and *considered as capital*".

If, in contemplation of *this section*, there were, after the passage of the act, expected to be companies lawfully doing business with a part of their capital still consisting of original stock notes, it is beyond my comprehension how the provisions of this section can be successfully brought into service to prove that no company in such condition could lawfully do business.

I can not see that the modification of the opinion in the slightest degree tends to support the judgment. I think the rehearing ought to be granted.