# JOHN B. WEIDENGER

*v.*

# HARMON SPRUANCE.

*Filed at Ottawa March 18, 1881.*

1. STOCKHOLDERS—*changing the conditions as to liability for debts of corporation, by subsequent legislation—under constitution of 1848.* Section 2, art. 10, of the constitution of 1848, which provides that "dues from corporations not possessing banking powers or privileges, shall be secured by such individual liability of stockholders of the corporation, or other means, as may be prescribed by law," was designed to express the reservation of power in the General Assembly in granting charters, to provide, from time to time, by legislation, as experience should suggest or wisdom dictate, for the securing of dues from corporations, by individual liability of the corporators, or other means.

2. The language of the section does not seem necessarily to require that this should be done in the charters, and be made a condition precedent to the exercise of corporate powers, but rather to cast upon the legislature the supervising duty of ascertaining what legislation shall be necessary to attain the desired end, and then to provide it; so that every stockholder in a corporation of a character not within the exception named, organized under that constitution, took his stock subject to this supervisory power of the General Assembly, and to be affected by whatever legislation in that regard the General Assembly might deem necessary.

3. The 16th section of the general Insurance law of 1869 provides, that "the trustees and corporators shall be severally liable for all debts or responsibilities of such company, to the amount by him or her subscribed, *until the whole amount* of the capital of such company shall have been paid in." The Commercial Insurance Company was organized under a special charter granted in 1865, which did not prescribe as a condition to the liability of the individual stockholders that the *entire capital* of the company should be paid in, nor did the charter, as considered for the purposes of the decision, contain any reservation to the General Assembly of power to amend it. Nevertheless, that provision of the act of 1869 was given effect as against the corporators or stockholders of the company for liabilities of the corporation accruing after the act went into effect,—and this, by virtue of the reservation of power to the General Assembly, in the constitution, to supervise, in that regard, the affairs of preëxisting corporations.

4. In giving such effect to the act it was not regarded as an impairment of the obligation of the contract between the prior stockholders and the corporation, or the creditors of the corporation. The act simply required preëxist-

ing corporations to cease to carry on their business unless they should comply with its provisions, and the liability imposed upon the stockholder is by way of penalty, only, for disobedience to this mandate.

5.   But the application of the act in respect to the stockholders of the Commercial Insurance Company is sustainable upon another ground.   The charter of the company authorized the directory to call in such an installment on stock subscribed as they might deem necessary,—not less than twenty per cent in cash,—and the balance to be secured in a prescribed manner.   Even if there was an implied authority, in the absence of any express grant of power to that effect, for the company to commence or prosecute business before the payment so authorized to be required, was made, still such implied authority but amounted to a license, subject to be revoked, except so far as acted upon, at any time, by the General Assembly.

6.   But the real obligation of the contract of each subscriber was, that he should pay for his stock.   A mere expectation on his part that the law would not be enforced in requiring all the capital stock to be paid in, was not a vested right.   It became the duty of the corporation to have payment made into its treasury of its capital stock, and if the stockholders failed to exercise their controlling authority in requiring that duty to be performed, it was competent for the General Assembly to impose a reasonable penalty, such as that prescribed in the act of 1869, for the non-performance of that duty, although the duty may have been declared, and its performance enjoined, by the principles of the common law or the provisions of a prior statute.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on writ of error to the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

This was an action of debt, brought by Joseph B. Weidenger, for the use of T. B. Elliott, against Harmon Spruance, as a stockholder in the Commercial Insurance Company, upon the individual liability of the defendant for a debt of the company to the amount of his stock, the capital stock of the company never having been paid in.   The court overruled demurrers to pleas of the defendant, and gave judgment against the plaintiff for costs.   This judgment was affirmed in the Appellate Court.

Messrs. SHUFELDT & WESTOVER, for the plaintiff in error: '

1.   The Commercial Insurance Company was organized under the public act of the General Assembly of Illinois, approved February 10, 1865.   The constitution of 1848, then in force, contained this clause: "Dues from corporations not possessing. banking powers or privileges, shall be secured by such individual liabilities of the corporators, or other means, as may be prescribed by law."   (Const. of 1848, art. 10.)   The Commercial Insurance Company received its charter, subject to such conditions as might be imposed by law, under that constitutional provision.   *Massachusetts General Hospital* v. *State Mutual Life Assurance Co.* 4 Gray, 227 ; *Suydam* v. *Moore,* 8 Barb. 358 ; *Story* v. *Jersey City, etc.. Plank Road Co.* 1 Green, (16 N. J. Eq.) 13 ; *Attorney General* v. *Railroad Co.* 35 Wis. 435.

2.   The constitution being virtually a reservation of the right to amend the charter of the corporations organized, under it, as to liability of corporators, section 16 of the general law of 1869 became, by the terms of the law, a part of the charter of all such companies.   *Tomlinson* v. *Jessup,* 15 Wall. 454; *Miller* v. *The State,* id. 478; *Suydam* v. *Moore,* 8 Barb. 358 ; *McLaren* v. *Pennington,* 1 Paige Ch. 102 ; *Roxbury* v. *Providence and Boston R. R. Co.* 6 Cush. 424 ; *Pennsylvania College Cases,* 13 Wall. 190 ; *People* v. *Manhattan Co.* 9 Wend. 351 ; *Schenectady and Saratoga Plank Road Co.* v. *Thatcher,* 11 N. Y. 102.

3.   The legislature thus amended the charter of this company, and by the amendment every stockholder or corporator became bound as to his individual liability.   *In re Reciprocity Bank,* 22 N. Y. 9 ; *Sherman* v. *Smith,* 1 Black, 587 ; *In re Oliver Lee's Bank,* 21 N. Y. 9 ; *Stanley* v. *Stanley,* 26 Maine, 191 ; *Baily* v. *Hollister,* 12 N. Y. 112.

4.   The capital stock of the company not being paid in, the defendant, a corporator in said company, became liable

to the plaintiff, individually, for the amount of the debt of the corporation to the plaintiff, not to exceed an amount equal to defendant's stock. *Culver* v. *Third National Bank,* 64 Ill. 529; *Butler* v. *Walker,* 80 id. 345.

Messrs. BOUTELL & WATERMAN, for the defendant in error:

Article 10 of the constitution of 1848 was not self-acting, in the sense of imposing upon the stockholders of corporations thereafter created, an individual liability. Legislation was needed to make it active or effective. *Hill* v. *City of Chicago,* 60 Ill. 86.

The charter of the company became and was a contract. It did not impose upon the stockholders any liability for the dues of the company. It exempted them from liability, and no legislature could thereafter, without the consent of this company, change its charter so as to impose a personal liability upon its stockholders. *Washington Bridge Co.* v. *State,* 18 Conn. 65; *Wheeler* v. *Frontier Bank,* 23 Me. 308; *Enfield Toll Bridge Co.* v. *Connecticut River Co.* 7 Conn. 44; *People* v. *Platt,* 17 Johns. 215; *Dartmouth College* v. *Woodward,* 4 Wheat. 518; Angell & Ames on Corp. secs. 4, 595.

The charter of the Commercial Insurance Company not containing any reservation to the legislature of a right to change it in any way, and not being subject to any such constitutional provision, the act of 1869 could not operate to impose upon defendant a liability which he was not before under. *Wheeler* v. *Frontier Bank,* 23 Maine, 308; *Ireland* v. *Palestine Co.* 19 Ohio St. 369.

The statute does not apply to such a case as the present:

*First*—Because companies theretofore organized are by section 19 especially excepted from the operation of the act. (Sec. 16, chap. 73, Rev. Stat.)

*Second*—Because section 16 applies only to the original corporators and trustees of companies organized under the

act. (Secs. 1, 3, 10, 16, 19, chap. 73, Rev. Stat.) Defendant was neither a corporator nor trustee.

*Third*—Because the Commercial Insurance Company was not organized under the act. The statute makes liable only trustees and corporators of companies organized under the act.

*Fourth*—Because the provision imposing personal liability is to be strictly construed. *Gray* v. *Coffin et al.* 9 Cush. 192.

Mr. Justice Scholfield delivered the opinion of the Court:

The present case differs from *Gulliver* v. *Rœlle*, 100 Ill. 141, in this: In that case the right to amend was expressly reserved in the charter; in the present case such right was reserved in an amendment to the charter, which the pleas aver was never accepted by the company, and so it must be taken for the present that no right of amendment was reserved in the charter; and the question therefore is, treating the 16th section of the general law as an amendment of this charter, does it impair the obligation of a contract? We are of opinion the answer should be in the negative.

By sec. 2 of art. 10 of the constitution of 1848 it is provided, that "dues from corporations not possessing banking powers or privileges, shall be secured by such individual liability of the corporators, or other means, as may be prescribed by law." This, it is to be observed, is not the expression of a *grant* of power, for the General Assembly without this, under its general legislative powers, might, in creating such corporations, provide any mode for securing the payment of debts to be contracted by them, deemed advisable. It is not the expression of a prohibition upon the creation of such corporations unless certain prescribed provisions shall be inserted in the charters, for the mode of securing the dues is left to be determined by the General Assembly; and it could not, therefore, be said that any exercise of that discretion, whatever it might be, is unconstitutional. We

can not suppose that in making an instrument of the import-
ance and dignity of a constitution, a mere idle lecture to the
General Assembly would be inserted; and so, to give effect to
the language, it would seem we might well conclude it was
designed to express the reservation of power in the General
Assembly in granting charters, to provide, from time to time,
as experience should suggest or wisdom dictate, for the secur-
ing of dues from the corporations, "by individual liability of
the corporators, or other means." The language employed
does not seem to necessarily require that this shall be done
in the charter, and be made a condition precedent to the
exercise of corporate powers, but rather to cast upon the
General Assembly the supervising duty of ascertaining what
legislation shall be actually necessary to attain the desired
end, and then to provide it. If this be conceded, then every
stockholder takes his stock subject to this supervision of the
General Assembly, and to be affected by whatever legislation
in that regard the General Assembly may deem necessary;
and so we have held in *Arenz* v. *Weir*, 89 Ill. 25.

But we shall not rest our decision purely on this ground.
The 2d section of the charter of the Commercial Insurance
Company provides for a capital stock of $200,000, divided
into shares of $100 each; and its 3d section authorizes the
board of directors to call in such an installment on the stock
subscribed as they may deem necessary,—not less than
twenty per cent in cash,—and for the balance of such sub-
scription they may take bonds, secured by mortgages on un-
incumbered real estate in the State of Illinois, or judgment
notes of responsible parties. (Private Laws of 1865, vol. 1,
p. 632.)

No authority is expressly given by the charter to commence
or prosecute business before the twenty per cent in cash is
paid in, and the balance is paid in bonds or judgment notes,
secured in the manner provided. But if it may be said that
such authority is implied, this implied authority can but

amount to a license, subject to be revoked, except so far as acted upon, whenever the General Assembly may so declare. It can not be said the obligation of the contract of the shareholder with the corporation, or with creditors of the corporation, or with the other stockholders, is, that the corporation shall proceed with its business when the capital stock is unpaid. On the contrary, the obligation of the contract of each subscriber is, that he shall pay for his stock, for this is his undertaking; and every creditor has a vested right that this shall be done, for he has become a creditor upon the faith of it. Every stockholder, moreover, has a vested interest in the contract of subscription of every other stockholder, for each subscription is a part of a complete whole, and the failure in the payment of one leaves the burdens to be borne by all, proportionally, that much greater. See *Chandler* v. *Brown*, 77 Ill. 333.

A mere expectation of property in the future is not a vested right. (Cooley's Const. Limitations, 359 ; *Richardson* v. *Aiken*, 87 Ill. 138.) And, upon like principle, a mere expectation that the law will not be enforced in requiring all the capital stock of a corporation to be paid in, can not be a vested right, nor can there be a vested right to do business upon a credit, without affording adequate security for the payment of the debts to be contracted. See *Richardson* v. *Aiken, supra.*

Whether we shall regard the rights of the corporation, treating it as a legal entity separate and distinct from the stockholders, or the rights of the stockholders as individuals, this must be so. The stockholders derive all their rights, as such, through and by virtue of the charter of the corporation, and they have only the right to demand that shall be done which the corporation may, under its charter, legally claim the right to do. The corporation owes the duty of having payment made into its treasury of its capital stock, but it can only be coerced into the performance of that duty by a power acting upon the *persons* who control and put in action

its corporate functions.  The mere intangible entity consti-
tuting the *legal person,* disconnected from the *natural persons,*
through whose agency effect is given to its powers, can not
be coerced, for the simple reason there is nothing there upon
which coercive power can take effect.  It is competent for
the General Assembly to impose a reasonable penalty for the
non-performance of a legal duty, although the duty may have
been declared, and its performance enjoined, by the prin-
ciples of the common law or the provisions of a prior statute.
*Chicago, Rock Island and Pacific R. R. Co.* v. *Reedy,* 66 Ill.
43; *Chicago and St. Louis R. R. Co.* v. *Warrington,* 92 id.
157; *Barnett* v. *Atlantic and Pacific R. R. Co.* 68 Mo. 56.

The 16th section of the general Insurance law of 1869 (Rev.
Stat. 1874, p. 595,) provides, that "the trustees and corpora-
tors shall be severally liable for all debts or responsibilities
of such company, to the amount by him or her subscribed,
until the whole amount of the capital of such company shall
have been paid in," as thereinbefore provided.  The object
of this was, unmistakably, to compel such companies, before
proceeding further, to have their entire capital paid in.  By
the 10th section of the same act, such companies are not
authorized to commence business, in the first instance, until
this is done.  It is, in effect, therefore, saying to old compa-
nies whose capital is not all paid in:  "Proceed no further!
Stop right here until all your capital stock is paid in; and if
you shall disregard this mandate, your trustees and corpo-
rators shall be liable for all debts or responsibilities you shall
hereafter create."  This is but the imposition of a penalty.
*Richardson* v. *Aiken, supra; First National Bank of Maryland*
v. *Price et al.* 33 Md. 487; *Cameron* v. *Seaman,* 69 N. Y. 396;
*Derrickson* v. *Smith,* 27 N. J. L. 166; *Steam Engine Co.* v.
*Hubbard,* 101 U. S. 188.

The stockholders elect the directors, and, through them,
carry into effect the corporate functions.  Presumably, the
directors act in obedience to the aggregate wishes of the

stockholders, and this, through by-laws and the aid of courts of equity in proper cases, may be made practically so. The board of directors can not proceed unlawfully in the exercise of the corporate franchise, without being liable to restraint by a court of equity, at the instance of a stockholder. *Coleman* v. *Eastern Counties Ry. Co.* 10 Beav. 1; *Bliss* v. *Anderson*, 31 Ala. (N. S.) 612.

As is said in Angell & Ames on Corp. (5th ed.) sec. 312, p. 363: "The directors are the trustees or managing partners, and the stockholders are the *cestuis que trust*, and have a joint interest in all the property and effects of the corporation; and no injury that the stockholders may sustain by a fraudulent breach of trust can, upon the general principles of equity, be suffered to pass without a remedy."

The case does not present the question of the competency of the General Assembly to increase the liability of the stockholder upon his contract of subscription, but the question is, merely, can the General Assembly, as to corporations already in being, forbid them doing business in the future until all their capital stock is paid in, and impose a penalty upon those by whom the corporate powers and functions are controlled and exercised, if they shall disobey this mandate? The liability upon the stockholder is not because he made a contract, which he has performed, to take and pay for so much stock, but because he, as a member of the corporation, and, therefore, a responsible agent in controlling and causing to be executed the corporate powers and functions, has allowed to be done, or failed to prevent the doing of, that which the law prohibited. As a punishment for the wrong he is responsible for, he is made liable to those injured thereby to the extent of his interest in the corporation, and of his agency presumed therefrom in causing or permitting the injury. The courts in Massachusetts and Maine have, as we conceive, gone farther than this, and hold that statutes imposing a personal liability on stockholders for the future

debts of corporations are free of constitutional objection.
*Gray* v. *Coffin et al.* 9 Cush. 192; *Stanley* v. *Stanley,.*26 Maine,
191; *Coffin et al.* v. *Rich,* 45 id. 507.

In *Gray* v. *Coffin,* SHAW, Ch. J. said: "This act was gen-
eral in its nature, extended to members of all corporations,
providing to what extent they should be liable to the claims
of creditors and all persons dealing with and becoming cred-
itors of any corporation. It was future and prospective in its
operation, regulating the rights of debtor and creditor, as they
should arise, expressly securing any right acquired by any
person against a holder of stock in any corporation, by force
of existing laws. It had no tendency to impair, or in any
way affect or modify, any power, privilege or immunity per-
taining to the franchise of any corporation, and therefore
seems to be within the just limits of legislative power." This
view is indorsed by the author in Thompson on Liability
of Stockholders, sec. 65. See, also, secs. 66, 67, 68.

In *Ireland* v. *Palestine Co.* 19 Ohio St. 369, a contrary
ruling obtained, and it was there held that such a law
impaired the obligations of the contract between the stock-
holder and the corporation.

It is unnecessary that we should, at this time, express any
preference as between these rulings. We refer to them merely
as showing the tendency of the judicial mind on a kindred
question to that here involved, and to distinguish the present
case from the cases in which they obtained.

We repeat, the liability here imposed upon the stockholder
is by way of penalty, only. He is not, in the first instance,
nor at all events, liable for the future debts of the corpora-
tion. And so, it is believed, there is nothing, even in the Ohio
case, in conflict with our ruling here. Our conclusion is, no
constitutional right is impaired by imposing this liability.

The decree will be reversed, and the cause remanded for
further proceedings not inconsistent with this opinion.

*Decree reversed.*

Mr. CHIEF JUSTICE DICKEY* dissenting:

In the case of *Gulliver* v. *Rœlle*, 100 Ill. 141, I endeavored to show that the word "corporators," in the 16th section of the act of March 11, 1869, was not used in that place in a sense synonymous with the word "stockholders," but was intended in that section to designate the original organizers or promoters of a corporation to be formed under that act, whose duties and powers were set forth in the preceding sections. I also endeavored to show, that even if we assume that the word "corporators," as used in section 16, was intended to mean all stockholders, still it was not intended by section 19 of that act to make section 16 applicable to then existing corporations, working under special charters.

In that case I also expressed the opinion, that as to existing stockholders in companies then doing business under special charters (even where the power of amendment of such charters was reserved to the legislature), the General Assembly did not possess the power to impose such new burden upon such stockholders without their consent and without their fault.

This latter proposition I did not then discuss, or attempt to support by authority. I now propose to give some reasons for the views I hold on this question, as applicable to the case at bar. In that case power to amend the charter was reserved to the General Assembly. In this, there is no reservation of that kind.

The decision in this case of this latter question is placed upon two grounds: First, an attempt is made to draw power from certain words in the constitution of 1848; and, secondly, the exercise of the power is defended upon a supposed or presumed agency resting in the hands of the officers of the corporation to commit offences, for which the stockholder, as principal, may be punished for the sin of his agents. I

---

* At the time of filing this opinion Mr. Justice DICKEY was Chief Justice.

will consider the latter proposition first, and then examine the source of power supposed to lurk in the language of the constitution of 1848.

When the State, by the act of 1865, adopted by its General Assembly, enacted that the persons named in that act, "and such *other persons* as might *become stockholders*," should be, and were by the act, declared to be "a body corporate and politic," with the powers and privileges mentioned in the act, and as soon as such corporation was duly organized, and the defendant in error became a stockholder under that charter, and his stock was fully paid, the defendant in error was clothed by the act with certain rights which he did not before have, and for which he had paid a valuable consideration. Those rights he held by purchase, and through a grant from the State of Illinois. His title to those rights was as sacred, and as thoroughly beyond the power of the General Assembly to take away or destroy, as is the right of any citizen to his private property. What were those rights? At common law the defendant in error had the right to associate with the other persons constituting this corporation, in a firm or partnership, and jointly to do an insurance business. In such case he would have rendered himself liable, as a partner, for any, all and every obligation of the association, and unless there had been a provision to the contrary in the articles of partnership, he would have been bound to give his personal attention to the business.

By the act of incorporation under which defendant in error became a stockholder, he acquired the right, upon paying in full for his stock, of being free from personal liability for the debts of the association, and the right to be free from any duty to give to the business his personal attention; and he also acquired the right to have a limitation on the power of his associates to bind him by their action. Without the act of incorporation he would have been liable, to the whole extent of his estate, for every contract made by any one of the asso-

19—101 ILL.

ciates in behalf of the association. Under the act he had a grant of the right of sharing as a stockholder in the profits of the business, without any one or more having an agency to affect by their action any part of his estate, except that part which he had placed in their hands by becoming a stockholder,—that is, his interest in the corporate property as the owner of his shares. Beyond this interest in the corporate property no part of his estate could, under the act, be controlled or incumbered by any one. He then held three rights granted by the State: First, the right to be a corporator, without being personally liable for the debts of the company; second, the right to be a stockholder, without giving to any one the power to charge any part of his estate, other than his interest in the corporate property, with any debt of the association; and, third, the right to be a stockholder, without any obligation on him to give his personal attention to the business of the association.

The grant, and the acceptance of the grant, in my judgment, made, by necessary implication, a valid, binding contract between the State and the defendant in error as such stockholder, by which the State undertook, in consideration that he would pay his money for his shares, that no further or other burdens should be imposed upon him, merely because he had, on the invitation of the State, become, and continued to be, such stockholder. If defendant in error held those rights by contract, the State could not impair the obligation of that contract, by imposing new burdens upon him, without violating the constitution of the United States. If it can not be said that the circumstances made a contract binding upon the State, it surely can not be denied that defendant in error held such rights by grant from the State, and hence had a title to them as sacred as any other private property, which the ablest jurists declare to be such that they can not be taken away by the mere fiat of a legislature. To support this position I will refer hereafter to some authorities.

The question in this case is thus squarely presented, whether as to a stockholder holding such rights under a charter, in reference to which no power of amendment was reserved to the legislature, either by the charter or by any statute then in force, the General Assembly had the power, on March 11, 1869, by its mere fiat, to change or violate such rights by imposing upon him, without his consent, the new duty or burden of causing all other. stockholders to pay in full for their shares, or of watching the officers of the company constantly, and preventing them, by suits in equity at his own cost, from incurring any further debts or responsibilities until the capital should be all paid in, and a certificate thereof should be duly filed and recorded, and the power to impose upon him a penalty for no other offence than that he had become a stockholder in this company on the invitation of the General Assembly, and had simply continued to be such stockholder.

I am clearly of opinion that the General Assembly was clothed with no such power. To maintain this position it is not necessary that I should question the power claimed for the General Assembly to say, by that act, to then existing companies, "Stop right here! Do no more business until your capital shall all be paid in, and a certificate thereof shall be recorded." It may be a legitimate exercise of the police power to compel companies to so conduct their business as not to expose the public to unreasonable risk of loss, nor need I here question the power of the legislature to enforce such a mandate by penalties imposed upon each of such corporations which should fail to obey the mandate, and for which the property and the franchises of the company might be taken, nor need I deny the power to punish, by personal liability as penalties, any and all persons (whether connected with the corporation or not) who should thereafter aid, abet or encourage the officers of such corporation in a violation of such mandate; and to thus punish the officers of the cor-

poration for failing to prevent the violation of such mandate, where their duty, voluntarily assumed, required them to supervise vigilantly the doings of the corporation. But it does not follow that penalties can be lawfully imposed upon the mere stockholder. He has no duty, as such, resting upon him (either by common law or by statutes in force when he assumed that position) requiring him to give his personal attention to the management of the business of the corporation. The directors chosen by the holders of the majority of the stock have no power to do any act by which that part of this stockholder's estate not invested in this company can be affected, and neither the legislature, nor any one else except this stockholder, can enlarge the power of attorney under which the directors act. It is error, therefore, to say that as to this new duty and new burden the officers of the company act, presumably, by the authority of the stockholder, so as to make their acts his, in any respect whatever, except in so far as the property of the corporation may be affected by the acts of such officers. By becoming a stockholder, defendant in error has agreed that, in so far as concerns the property of the corporation, he is to be bound by their acts, but *no farther.*

The decision of the Supreme Court of Ohio is directly in point in support of my views upon this question, in *Ireland* v. *Palestine Turnpike Co.* 19 Ohio St. 369. In that case the company was organized in January, 1852, under an act passed in 1849. Ireland was one of the subscribers to the stock, and had paid in full his subscription. The law under which he became a stockholder (as in this case) imposed no individual responsibility upon the stockholders beyond the payment of the amount of their subscriptions. By acts passed after Ireland became a stockholder, it was provided that turnpike companies might issue bonds for certain purposes, and that the stockholders of all companies which should issue such bonds should be liable individually, to the

amount of their stock, for the payment of bonds so issued, and that stockholders in such cases might, if a majority of them should so determine, be assessed upon their stock, and compelled to pay to the company, *pro rata* of the indebtedness, an amount not exceeding the amount of their stock. Ireland refused to pay an assessment made upon him in pursuance of these statutes, and a judgment was given against him for the amount of his assessment. That judgment was brought before the Supreme Court for review, and was there reversed. That court held that the statute, in so far as it authorized assessments against stockholders who had paid their subscriptions, and who, by the laws in force when they became stockholders, were not liable individually for the debts of the company, was *unconstitutional*. It was there said of such a statute: "It impairs the validity of the contract between the company and the stockholder. In a contract between the company and a stockholder, or in an action by the former or by its creditors, the stockholder is to be regarded as an individual person, separate and distinct from the corporation. He becomes a stockholder by virtue of a contract with the company, and he has a right to stand upon the *terms* of *that contract*, interpreted and limited by *the laws* under which it was made. By his contract with the company, Ireland agreed to pay a specified sum, and no more. This sum he has paid, and to require him to contribute an additional amount would be to violate the contract." It is added: "The stockholder may waive his constitutional right, and become liable by his *own act* or *consent*.    *    *    *    The burden of showing such consent or acquiescence rests with the party seeking to hold him liable, or estop him from denying his liability. Nor was this a matter as to which the directors, or even a majority of the stockholders, were authorized by law *to act for him*. The power of a corporation over the rights of a stockholder, whether exercised by the directors or a majority of the stockholders, is limited to his rights in

the corporate property, and does not extend to his private and individual property. As to the latter, the stockholder gives the company no authority whatever beyond the amount of his subscription, and no *subsequent* legislative grant of such power will be valid without his assent. This distinction between the private rights and the corporate rights of the stockholders should never be lost sight of, and its application will go far to reconcile many of the authorities which appear to be conflicting. \* \* \* By becoming a member, the stockholder places a specified amount of his private property in the common fund, and subjects it to the control of the company, \* \* \* but he grants no power whatever over the remainder of his private property, which is wholly unaffected thereby. As to the latter, the company has no more authority than it has over the property or rights of a stranger."

Chief Justice Shaw, in *Stedman* v. *Eveleth,* 6 Metc. 121, speaking of the extent of the powers of officers of a corporation as agents of the respective stockholders, said, very emphatically: "They are not agents of the stockholders in their *personal capacity.*"

In the case at bar, therefore, although each stockholder is an individual part of the corporation, it can not properly be said, for that reason alone, that he is to be regarded as a party to and an actor conjointly with the directors, in permitting and causing that to be done which the law forbids, except in so far as concerns his interest in the property of the corporation. Thus far he is liable to be affected by the action of the company; thus far the majority of the stockholders, or the officers, may be regarded as his agents; but as Chief Justice Shaw has well said, the officers of the corporation "are not agents of the stockholder in his *personal* capacity." It is a personal liability with which Spruance is here charged. In that regard neither the officers of the company, nor a majority of the stockholders, nor the legislature,

nor any or all of them combined, can, under our institutions, charge him by contract or tort, or in any other mode, with a personal liability, without his personal consent and without his personal fault.

It is said in support of the conclusion reached in the case at bar: "The stockholder is not made liable because he has made a contract which he has performed, * * * but because, as a responsible *agent* in the controlling and executing the corporate powers and functions, he has done that which the law prohibited. As a punishment for the wrong he is responsible for, he is made liable to the extent of *his agency*, presumed therefrom, in causing the wrong." There is nothing in this record tending to show that Spruance ever acted, or had power to act, as the agent of this corporation. It seems to me it is not enough to concede that the contract of the stockholder does not subject him to this new and additional burden; but in addition to that, his contract, by *necessary* implication, was, that no additional burden should be imposed upon him merely because of his being a stockholder, and this contract is violated by the imposition of a new burden.  And, aside from this protection by the necessary implication of his contract, we have seen that he is not the agent of the corporation, for he can not bind the corporation by any bargain he may make or by any act he can do, nor is the corporation, or all its officers, his agents "in his personal capacity." There is no "presumed" agency arising from his relation as stockholder beyond what affects his interest in the corporate property. The acts of the directors outside that sphere are not his acts,—their guilt is not his guilt. The legislature has no power, by mere fiat, to change innocence into guilt, and punish it as such. It was no crime to be a stockholder when Spruance became a stockholder. The legislature can not, by a subsequent statute, make it penal to be, or to continue to be, a stockholder. It can not, by legislation, make innocence guilt.

In support of this general view of the limited powers of
every legislature, under a constitution where the legislative
powers alone are conferred upon one department, and in sup-
port of the protection to the rights to private property, and
the sanctity of contracts against encroachment by State
statutes, afforded under our political institutions, I bring the
solemn declarations of Marshall, Kent, Story, Shaw, and
other great jurists.

The sanctity of the right of the subject or citizen to his own
private property, and the inviolability of private contracts,
have been recognized and vindicated by the jurists of all
civilized communities, and his right to hold his private prop-
erty free from confiscation (whether directly or indirectly)
by mere legislative fiat, has, in one form or other, been
held sacred in all countries where powers legislative, execu-
tive and judicial have been each committed to a separate
class of officers. All American courts have in some mode
or other refused to give effect to statutes whose words seem
to warrant violation of such rights. Jurists have not been
entirely in harmony as to the mode of reasoning on which
they have heretofore refused to render such judgments.
Some (asserting the power of a legislature to pass such laws
where they are not forbidden by any constitution) avoid such
result by pronouncing the same so monstrous that they will
not hold that the legislature intended, by the language of the
statute, to produce such result. Other jurists avoid such
result by holding that the constitutional inhibitions against
the passing of any *ex post facto* law, or any law impairing
the obligation of contracts, and against the passing of bills
of attainder, prohibit expressly such result. Others (con-
ceiving that such rights of the citizen are not within the pro-
tection of these express limitations found in the written con-
stitutions) hold that statutes doing violence to such private
rights are void, because they are not within the scope of
*legislative* authority. The constitution of 1848, by which

"the legislative authority of this State" was "vested in" the General Assembly, contains a clause which seems to exclude the power of passing such laws from the general grant of "legislative authority," in which clause it is declared that "all men have certain inherent and *indefeasible* rights, among which are those of acquiring, possessing and protecting property." If such rights be *indefeasible*, they surely can not be abrogated, impaired, or made void, by the exercise of any *legislative* authority, for such authority does not embrace power to invade, in the slightest degree, an indefeasible right of the private citizen. Thus it will be seen that in that constitution the truth was recognized that many individual rights are not derived from the constitution.

Mr. Webster said: "Written constitutions sanctify and confirm great principles, but the latter are prior in existence to the former." Cooley says: "In considering State constitutions we must not commit the mistake of supposing that because individual rights are guarded and protected by them, they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights of the governed." (Cooley's Const. Lim. 37.) He quotes in this connection, with approbation, the happy language of Judge BATES, used in argument, wherein he said of a constitution: "It is not the origin of private rights.  *  *  *  It grants no rights to the people, but is the creature of their power, the instrument of their convenience, designed for their protection in the enjoyment of rights  *  *  *  which they possessed before the constitution was made."

The right of the owner to his private property is of this character. It is a fundamental, "indefeasible" right in Illinois, and it can not be taken away lawfully, without his consent, given by him directly, or given by reasonable (if not *necessary*) implication, arising from some contract which he has made, unless it be by way of *penalty* for his *own wrong*, or for public

use, upon just compensation. A statute passed by the General Assembly to deprive the owner, by mere enactment, of his right to his private property,—a right declared by that constitution to be *"indefeasible,"*—is therefore void, for want of constitutional authority to pass it.

In *Fletcher* v. *Peck*, 6 Cranch, 138, Chief Justice MARSHALL, delivering the opinion of the Supreme Court of the United States, said: "The constitution of the United States contains what may be deemed a bill of rights for the people of each State. No State shall pass any bill of attainder, *ex post facto* law, or law impairing the obligations of contracts. A bill of attainder may affect the life of an individual, or may confiscate his property, or may do both. In this form the power of the legislature over the lives and fortunes of individuals is expressly restrained. The legislature is then prohibited from passing a law by which a man's estate, or any part of it, shall be seized for a crime, which was not declared by some previous law, to render him liable to that punishment. Why, then, should violence be done to the natural meaning of words for the purpose of seizing for public use the estate of an individual, in the form of a law annulling the title by which he holds that estate?"

In that case, the legislature of Georgia, having granted a tract of land to one who conveyed it to another, passed a statute rescinding the act by which the land was granted. Speaking of this latter statute, MARSHALL says: "This rescinding act would have the effect of an *ex post facto* law. It forfeits the estate of Fletcher for a crime *not committed by himself*, but by those from whom he purchased. This can not be effected in the form of an *ex post facto* law, or bill of attainder. Why, then, is it allowed in the form of a law annulling the original grant?"

In the case at bar, Spruance is punished, by a forfeiture of a part of his private estate, for an offence "not committed by himself, but by the corporation from whom he or his grantor

purchased this stock." Chief Justice MARSHALL says, "this can not be effected in the form of an *ex post facto* law, or bill of attainder. Why, then, is it allowable in the form of a law annulling the original grant" to him of the right of being a stockholder of this corporation, holding full paid stock, without being liable for the debts of the corporation?

In *The Society, etc.* v. *Wheeler et al.* 2 Gallison, 139, Judge STORY declared, that "upon *principle*, every statute which takes away or impairs vested rights acquired under existing laws, *or creates a new obligation, imposes a new duty* in respect to transactions or considerations already passed, must be deemed retrospective." And he adds, that where such a statute affects vested rights and past transactions by "operating only from and after its passage," to hold such a statute not to be retroactive, and therefore valid, "would enable the legislature to accomplish that indirectly which it could not do directly."

Chief Justice PARKER, in *Medford* v. *Learnerd*, 16 Mass. 215, said: "No legislator could have entertained the opinion that a citizen free of debt. *could be made a debtor* by a legislative act declaring him one."

The subject of the invalidity of a statute, in so far as it is made to operate in the future so as to injuriously affect a right vested before the passage of the act, is ably discussed by Chief Justice KENT in *Dash* v. *Van Kleet*, 7 Johns. 500, and its invalidity declared as resulting from the nature of our social compact.

Cooley on Constitutional Limitations, p. 19, refers to the constitutional provision against passing bills of attainder, as made to protect individual rights against possible abuse of State power, and on page 47, as to the powers of a State in making laws, even in its constitution, he says: "It must not assume to violate the obligation of any contract, or attaint persons of crime;" and on page 319 he says this latter constitutional provision was "undoubtedly aimed at any and

*every species of legislative punishment* for criminal or supposed criminal offences."

In *Terret et al.* v. *Taylor et al.* 9 Cranch, 50, Judge STORY declared, that "if the legislature possessed the authority to make a grant, it is very clear to our minds that it vested an indefeasible and irrevocable title. We have no knowledge of any authority or principle which could support the doctrine that a legislative grant is revocable in its own nature, and held only *durante bene placito*. Such a doctrine would uproot the very foundation of the right of the citizen to the free enjoyment of his property legally acquired."

These declarations of fundamental principles are all in support of the teachings of the case of *Ireland* v. *Palestine Turnpike Co.*, *supra*, and accord with the view I take of the law, which ought, in my judgment, to govern in the case at bar.

It seems to be supposed that the courts of Massachusetts and of Maine have made decisions which are not in harmony with the views expressed in the Ohio case, referred to; and *Gray* v. *Coffin et al.* 9 Cush. 192; *Stanley* v. *Stanley*, 26 Maine, 191, and *Coffin* v. *Rich*, 45 id. 507, are cited as incompatible with the ruling in Ohio. This, I think, is an error. I find nothing in these cases which militates against my views, or those expressed by the Supreme Court of Ohio.

In the case of *Gray* v. *Coffin*, by the laws of that State in force when the corporation was organized, each stockholder was made liable for the debts of the corporation. Afterwards, in 1838, a statute was passed preserving the rights of all creditors of the corporation who had become so upon the faith of such personal liability of all the stockholders, and providing, as to all persons who should in future become creditors of the corporation, persons holding stock in trust as trustees, executors, etc., should not be personally liable for such debts of the corporation. After this law passed, the defendants in that case acquired shares of stock as assignees of insolvent owners of such stock. After this, and while this

act of 1838 was in full force, the corporation became indebted to the plaintiff. The defendants claimed that they held this stock as trustees. The plaintiff contended that the act providing immunity to stockholders, holding as trustees, was in that respect unconstitutional. It was as to that question Ch. J. SHAW said the act was general, extending to members of all corporations, and providing *the extent* to which they should be liable to all persons dealing (thereafter) with the corporation, and that the act was future in its operation, regulating the rights of creditor and debtor as they should *thereafter* arise, *expressly* securing any right acquired by any person against the holder of stock in any corporation *by force of existing laws,* and, as it impaired in no way the franchise of the corporation, he added, the act "therefore seems within the limits of legislative power." This great jurist here recognizes the idea that legislative power has limits, and that if the act had impaired the franchise of the corporation, or had not secured the already acquired rights of creditors against stockholders, under laws in force when such rights against the stockholders accrued, the act would not have been within the limits of legislative power. That act was constitutional, because it did not invade the vested right of any creditor; this act is unconstitutional, because (as construed by this court) it did invade the vested right of the stockholder. Stockholders have rights as well as creditors. The same court, in *Commonwealth* v. *Cochituate Bank,* 3 Allen, 44, declared, that "the liabilities of the stockholders of" that bank "must be found in the statutes passed *previously* to its incorporation."

In the case of *Stanley* v. *Stanley,* 26 Maine, 191, the corporation was chartered in 1833, subject to a general law then in force, reserving power in the legislature to amend all charters. In 1839 an act was passed subjecting stockholders of all corporations created after 1831, to liability for all debts created by the corporation after 1839. The debt of the cor-

poration was created after 1839, and the defendant *became a stockholder after that time,* and the court held him liable, because, by becoming a stockholder *after* the passage of the statute *imposing the liability,* he is regarded, "therefore, as *assenting thereto."* Holding a stockholder to a liability which he voluntarily assumed at the time when he became a stockholder, is one thing, and holding him liable to a new burden imposed by statute *after* he became a stockholder, and without his assent, is another and very different thing.

In the case of *Stanley* v. *Stanley, supra,* the corporation was organized when there was in force a general statute reserving, in all cases, to the legislature power to amend all charters, and by an act passed in 1839, stockholders in such corporations were made liable for debts of corporations, to the amount of their stock. After this law was passed the debt of the corporation was contracted, and the stockholder in the case became a stockholder after this. And the court said: "The debt was incurred after the act of 1839, and the plaintiff became a stockholder after that time. He may be regarded, therefore, as having become so with a full knowledge of the liability, and *therefore* as *assenting thereto."*

*Coffin* v. *Rich, supra,* was an action by a creditor of a corporation seeking to recover of a stockholder plaintiff's debt against the corporation. A statute in force at the time when the defendant became a stockholder imposed upon stockholders a personal liability for debts of the corporation, and the court said: *"When* stockholders *became members,* they knew the law held them personally responsible for the corporate debts." In that case, however, judgment was given for the stockholder, upon the ground that the statute imposing the liability was repealed after he became such stockholder, and he was thereby relieved from the liability.

I find nothing in these cases in conflict with the views presented in the Ohio case. There are some general words found in the opinions, which, when read by themselves, and

without reference to the facts under discussion, seem to go farther than this; but this is the extent of their meaning when read in connection with the rest of the opinion, and in reference to the facts before the court. In fact, in an earlier case, which these cases in Maine do not profess to overrule, and with which (when read carefully and at large) they are in entire harmony, this same court expressed views necessarily in full support of the thoughts so well expressed by the Supreme Court of Ohio,—views founded upon the same constitutional principles. I refer to the case of *Wheeler* v. *Frontier Bank*, 23 Maine, 239. In that case the court, in commenting upon a statute of that State, the language of which was general, imposing personal liability upon stockholders, without expressly limiting the same to those who might thereafter become stockholders, had said (p. 310): "We can not think it requires the citation of authority, or an elaborate course of reasoning, to prove that the legislature *can not* have the power to create a liability of an individual for a debt for which he was not before liable, nor can they authorize an attachment of property of any one, and the disposition of it, to pay a debt which he had not before contracted to pay. *After* the passage of the act of 1836, those who became stockholders might well be considered as having become so with a view to, and an acquiescence in, the liability created by the act; but those who *previously* had become owners of stock, when no such liability had been provided for, would *certainly* have a right to complain if their stock could be taken from them to pay a debt for which they had not *before* been in any manner liable." When the opinions in *Stanley* v. *Stanley*, and in *Coffin* v. *Rich*, are read in the light of this clear declaration of the true limitations of legislative authority, their true meaning can not be misunderstood; and they do not at all conflict with the views of the Supreme Court of Ohio in *Ireland* v. *Palestine Turnpike Co. supra.*

It may be that the legislatures of Massachusetts and Maine have gone further than ours in the imposition of personal liability upon those who should, in the future, become stockholders in some classes of corporations; but so far as I have been able to discover, their courts have in no case gone so far as to impose new burdens on stockholders by statutes passed after they became such stockholders, where there was no power to do so reserved in laws in force at the time when such stockholders acquired their stock.

The position is, however, taken, that authority in the legislature to impose new liabilities upon a stockholder, by statutes passed after he has become a stockholder (upon the faith of a charter protecting him from such burdens), is to be found in the words of the constitution of 1848, wherein it is said: "Dues from corporations not possessing banking powers or privileges, shall be secured by such individual liability of the corporators, or other means, as may be prescribed by law."

It is said this "is not the expression of a grant of power," that it is not "the expression of a prohibition" upon the exercise of legislative discretion as to the terms of charters to be granted, and that it is not "a mere idle lecture to the General Assembly;" and "so, to give effect to the language," it follows that this language was "designed to express the *reservation* of power in the General Assembly in granting charters, to provide, from time to time," for the securing of dues from corporations "by individual liability of the corporators, or other means." I agree that this clause is neither a grant of power, nor a limitation of power, nor a mere idle lecture to the General Assembly; but I can not accede to the postulate implied in the proposition, that if neither, it must be deemed a *reservation* of authority or power. It *may*, it seems to me, be an imperative mandate upon the General Assembly, which, by the obligation of the oath of each member to "support the constitution," each member in the General Assembly is bound, in the discharge of his official duty, to

regard and obey. This is the view of that clause expressed by this court in the late case of *Gulliver* v. *Rœlle et al.*

Again, it can not be a reservation of power in the legislature to rescind a grant of a property right given by the legislature, and accepted and paid for by the grantee, or to violate the obligations of a contract, or to take the private property of one and give it to another; for we have shown, upon the highest authority, that power to do these things does not lurk within general words vesting in the General Assembly the legislative powers of the State, because such a power is not legislative, in the true sense. It is impossible to reserve to the legislature a power it does not possess. Nothing, in the nature of things, can be reserved which is not possessed. It is well said, that without this clause the General Assembly, "under its general legislative powers, might, in *creating* corporations, provide any mode deemed advisable for securing the payment of debts *to be contracted* by them." It might well have been added, under its general legislative powers the General Assembly could not thereby impose any personal and new liability upon a stockholder, at any time after he had become a stockholder, under law not imposing upon him such liability. *That* is the power involved here. If not derived from the general grant of legislative authority, but derived from this clause, it follows that this clause must be a grant of power not embraced in the general grant of legislative powers. The opinion says it is not the expression of a grant of power, while the judgment in this case gives to it the effect of a grant of extra power.

It is said, "the language employed" (in this clause of the constitution) "does not require that this" (the making provision for securing such dues of corporations) "*shall* be done in the charters, and made a condition precedent to the exercise of corporate powers,"—in other words, the exercise of this power *after* the subscription to the stock is not expressly prohibited. This may be true. It is equally true that it is

not expressly provided that the power *may* be exercised after the rights of the stockholder shall have become fixed by his contract, under the law. It seems to me, therefore, that (it being conceded that the clause is not a grant of a new power) the reasonable conclusion is, the General Assembly was thereby commanded to secure the payment of the dues from corporations by the exercise of "the legislative authority" vested in it by the general grant thereof, found in section 1, article 3, of the same constitution; and we have the highest authority, as we have seen, for saying that under that *general* grant such liability could not be imposed after the rights and liabilities of the stockholder became fixed. The only individual liabilities required to be used for securing dues from corporations are "such as may be prescribed by law." If, in the absence of this clause, the General Assembly had no power to prescribe by law new burdens for the stockholder, except such as might be imposed *before* his rights and liabilities became fixed, then the requirement is by these words expressly limited to liabilities to be fixed *prior* to the contract of the stockholders.

To me the words of this section of the constitution of 1848 seem simple and plain. They seem to me to constitute, simply, the declaration of a duty imposed by the constitution upon the General Assembly to pass such laws as, in the judgment of the General Assembly, might be wise, to secure dues from corporations, and this was to be done by the imposition upon the corporators of such personal liabilities as should be prescribed by law, or by such other means as might be prescribed by law. The mandate did not impose upon the legislature the duty of imposing upon corporators any liability whatever. The security was to be provided in that way, or by some "other means" to be prescribed by law. There is nothing in these plain and simple words suggestive of a power to be exercised which had been denounced in the highest courts of the land as violations of our social compact,

destructive of indefeasible rights, and as not embraced in a general grant of legislative powers. Had it been even suspected that under these plain words lay hidden the power now claimed to arise from them, can any man suppose that capitalists from abroad could ever have been induced to become stockholders in any of the corporations by which the grand network of railroads has been constructed, which now bear off the products of every part of the State? Let it be remembered, that if this construction of that clause be the true one, every holder of a single share in every one of these corporations, successful or unsuccessful, by becoming such a stockholder put himself in the power of the General Assembly, and made himself liable to be made (by a mere statute to be thereafter passed) to pay, to the extent of his entire estate, the millions of debt incurred by the corporation, with no mode of escape which occurs to my mind. Few men would have exposed their entire fortunes voluntarily to such danger of unfriendly legislation. Fortunately for this country they did not *then* understand the full force of these seemingly harmless words in that constitution.

I am fully pursuaded that the conclusion reached by the court in this case is not that indicated by the law of the land, and it seems to me that the principles upon which it is placed, if carried to their logical results, must disturb rights which have ever been thought well protected under our constitution and institutions.

Mr. JUSTICE SHELDON also dissents.